UNITED STATES of America, Plaintiff,

v.

CENTRAL ADJUSTMENT BUREAU, INC., et al., Defendants.

No. CA 3–80–1671–R.

United States District Court, N.D. Texas, Dallas Division.

Oct. 28, 1986.

Raymond W. Phillipps, Randy S. Chartash, Consumer Affairs Section, Antitrust Div., U.S. Dept. of Justice, John F. LeFevre, Div. of Credit Practices, Bureau of Consumer Protection, Federal Trade Comn, Washington, D.C., for plaintiff.

Alan J. Hostetter, Claude P. Wilson, Jr., George Carrison Potts, Golden, Potts, Boeckman & Wilson, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This opinion concerns serious violations of almost every prohibition in the Fair Debt Collection Practices Act, 15 U.S.C. § 1692.[1] It constitutes this Court's findings of fact and conclusions of law under Rule 52(a), Fed.R.Civ.P.

### I. *Introduction*

The government charges that the defendant, Central Adjustment Bureau, Inc. ("CAB"), has consistently and repeatedly violated the Fair Debt Collections Practices Act, 15 U.S.C. § 1692. The defendant denies these charges.

Two trials were held. The first was limited to evidence concerning the defendant's headquarters and its regional collection office in Dallas. The second was limited to the six regional collection offices discussed in Appendix A to this opinion.

At the request of the defendant, which complained bitterly about the expense of this litigation, the government's discovery —and, thus, its evidence at the two trials— was limited to the defendant's headquarters and to a representative number of the defendant's 26 regional collection offices. And, also at the instance of the defendant, the number of depositions which the government was permitted to take in each region was limited. See, e.g., Appendix B, 412. However, again at the defendant's request, this Court denied the government's motion to resolve this matter "on the papers" before the second trial— because it was necessary for this Court to judge the credibility of the witnesses (primarily debtors, present employees of the defendant, and ex-Central Adjustment Bureau employees), who gave dramatically conflicting testimony.

In making the credibility findings concerning the witnesses whose testimony was presented at both trials—which are recited in Appendix A (387–398) and in Appendix B (403–408). This Court considered all of the circumstances under which the witness testified: the demeanor of the witness in court or as revealed in the deposition; whether the witness had some personal interest in the outcome of the case; whether the testimony was inconsistent, or whether it was supported or contradicted by other credible evidence; whether the witness was impeached concerning some material matter.[2]

This Court has not automatically credited the witnesses for the government and discredited those of the defendant. Indeed, at the first trial, several of the witnesses for both parties were discredited (Appendix A, 403–408). However, at the second trial, the government's choice of witnesses was obviously affected by the Court's credibility choices at the first trial; accordingly, Appendix A credits the testimony of more

---

1. Citations in this opinion will be to the section numbers of the Act, Public Law 95–109 (Sept. 20, 1977), specifically to §§ 802–817 (*which correspond to 15 U.S.C. § 1692–1692o* ).

2. In most instances, the various debt collectors who testified for the defendant had no independent recollection of what had taken place—and were simply reading the entries that had been made on the debtor's file jacket. See, e.g., the witness Don Goodwin from the Atlanta office; and the witness Dale Semore, from the Richmond office (Appendix A, 387, 392).

government witnesses, and discredits the testimony of more of the defendant's witnesses, than was done in after the first trial (as reflected in Appendix B).

This opinion incorporates the stipulations of facts presented by the parties at both trials. It also includes (i) as *Appendix A*, the credibility findings concerning the evidence at the second trial; and (ii) as *Appendix B*, the oral findings of fact and conclusions of law (and credibility choices) delivered in open court after the conclusion of the first trial.

## II. *Applicable Legal Standard*

■ Under the Fair Debt Collection Practices Act, the test is not whether "a reasonable consumer" would be deceived, misled or harrassed by the prohibited practices—because the Act is intended to protect "unsophisticated consumers." Therefore, this Court must look not only at the "reasonable consumer," but also to *a less sophisticated consumer* in determining whether the debt collection practices act has a tendency or capacity to deceive. *Jeter v. Credit Bureau*, 760 F.2d 1168, 1172–73 (11th Cir.1985); *Baker v. G.C. Services*, 677 F.2d 775, 778 (9th Cir.1982).[3] See also *Bingham v. Collection Bureau, Inc.*, 505 F.Supp. 864, 870 (N.D.Dak.1981); *Wright v. Credit Bureau of Georgia, Inc.*, 548 F.Supp. 591, 599 (N.D.Ga.1982), *reconsidered*, 555 F.Supp. 1005, 1007 (N.D.Ga.1983); *Rutyna v. Collections Accounts Terminal, Inc.*, 478 F.Supp. 980, 982 (N.D.Ill.

**3.** The *Jeter* standard of the "least sophisticated consumer," 760 F.2d at 1175, makes a difference as to only one matter—the defendant's Form CABCO 1—and requires a modification of this Court's findings and conclusions in Appendix B. With respect to every other collection practice in issue, this Court would reach the same conclusion whether the standard used was a "reasonable consumer" or "a less" or "the least" sophisticated consumer.

**4.** This Court was wrong when it indicated, after the first trial, that the matter of telephone violations was relatively minor because it appeared to involve only two of the CAB debt collectors in Dallas. See Appendix B, 407–408, 412.

**5.** The defendant's argument—that "none of [the witnesses] testified that the calls were received at times which were inconvenient for them"

1979). *Contra Blackwell v. Professional Business Services of Georgia*, 526 F.Supp. 535, 537–538 (N.D.Ga.1981).

## III. *Telephone Violations*

■ The government did prove by a preponderance of the evidence the use of "abusive, deceptive and unfair debt collection practices" by the defendant and many of its debt collectors (*including some of the supervisors and managers in the defendant's regional collection offices*).[4] This evidence, which is summarized in Appendix A (offices besides Dallas) and in Appendix B (Dallas office), shows that the defendant has—as alleged by the government—engaged "in consistent and widespread abuse of consumers in direct violation of the Fair Debt Collection Practices Act." Specifically, the defendant CAB and its debt collectors in various regional offices consistently and repeatedly violated the Fair Debt Collections Practices Act:

... by making telephone calls to debtors at inconvenient times, before 8:00 a.m. and after 9:00 p.m. [§ 805(a)(1) ];[5]

... by making calls to the debtor's place of employment after being told not to do so by the debtor or the employer [§ 805(a)(3) ];[6]

... by contacting third parties about the debt without the consent of the debtor [§ 805(b) *and* § 804];

... by making harrassing and abusive telephone calls to debtors and relatives,

(Defendant's Response of Oct. 9, 1985, p. 3)—is baseless. § 805(a)(1) provides that debt collectors are to "assume that the convenient time for communicating" with a debtor is after 8:00 a.m. and before 9:00 p.m. unless they "have knowledge of circumstances to the contrary."

**6.** Before trial, the defendant took the position that it was not a violation of § 805(a)(3) to continue to call the debtor's place of employment if the debtor "only" requested the collector to stop such calls, and did not state expressly that the employer prohibited such communications. (Defendant's Response of October 9, 1985, pp. 4–5). However, at trial, the defendant's witnesses all professed that they stopped calls to the debtor's place of employment, whenever the debtors asked them to do so. See *United States v. ACB Sales & Service, Inc.*, 590 F.Supp. 561, 565 (D.Ariz.1984).

including the use of racial slurs,[7] belligerent threats, and terms like "liar, deadbeat, crook," etc. [§ 806];

... by using obscene and profane language in collection calls, including the terms "god-damn liar, low-down son of a bitch, shit, the judge doesn't give a fuck about your complaint,[8] hell, shit, and asshole" [§ 806(2)];

... by making repeated phone calls to debtors, as many as 4–5 calls or more to the same debtor in a single day [§ 806(5)];

... by making false representations designed to make the debtor believe that the caller was an attorney [§ 807(3)];

... by making false representations that the debtor would be arrested or jailed, or that the debtor's property would be seized or garnished to pay the debt [§ 807(4)];

... by threatening to sue or take other action which was not intended because the CAB clients had not authorized the filing of any lawsuit [§ 807(5)];[9]

... by falsely representing that the debtors were guilty of crimes and would go to jail because debts were not paid [§ 807(7)];

... by using false and deceptive means to collect debts [§ 807(10)], such as defrauding a debtor's mother by convincing her that the daughter's college grades would be revoked—and her degree would be cancelled—if the mother did not immediately pay a $400 debt owed to a college. (Appendix A, 393);

... by soliciting post-dated checks with the purpose of threatening criminal prosecution [§ 808(3)]; and

... by failing to validate the accuracy of the claim or by continuing collection efforts after receiving written notice that the debt had been paid or was disputed [§ 809].[10]

More particularly, the evidence summarized in Appendix A and Appendix B—including the testimony of debtors and of ex-employees of the defendant, and the exhibits—established the following violations of the Fair Debt Collection Practices Act:

*§ 805(a)(1)—Inconvenient Calls:* violations in the Atlanta, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 405 and 407).

*§ 805(a)(3)—Calls to Place of Employment:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404–405).

*§ 805(b)—Communications With Third Parties:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404–405).

---

7. The racial slurs included: "I don't know why they let people like you [blacks] go to school in the first place" (Appendix A, 388); "You people [blacks] think that you can get a free ride in society" (Appendix A, 393); "You [blacks] call each other 'brother' because you don't know who your father is" (Appendix A, 394); "Don't put off payment until 'manana,' because isn't that what all your people [Hispanic] do anyway, put things off until manana" (Appendix A, 396).

8. Before trial, the defendant took the position that any "profanity and other abusive and demeaning language" which did occur may have been used by CAB employees who were "collecting *commercial* accounts" (instead of *consumer* accounts covered by the Act). Defendant's Response of October 9, 1985, p. 7. However, at trial, the defendant's witnesses testified that no profanity or abusive language was *ever* used by CAB debt collectors, whether the account was a commercial or consumer debt.

9. At trial, the defendant's witnesses testified that the debt collectors *always* used the terms "suit

*could* be filed" (not "would be filed"), or "your property *could* be garnished" (not "would be garnished"). This testimony is specifically rejected because it was not credible—and, because it was contrary to the testimony of ex-employees of the defendant and of debtors which this Court has credited. See Appendix A, 389, 390, 391, 394, 397, 398; and Appendix B, 404–405, 405–406, 407. See also Govt. Exh. A–177, a "collector's talk-off sheet" used in the defendant's Cleveland office, which begins: "My name is ___ and I've been hired by [client name] and *they've asked that we file a district civil lawsuit,* if necessary, to recover ___." Appendix A, 398.

10. The evidence also established that many of the other violations—such as repeated or harassing telephone calls—took place *even though the bill had already been paid by the debtor.* See Appendix A, 387, 389–390, 395, 398; Appendix B, 407.

*§ 804—Location Information:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A under sections titled "§ 805(b)— Communications With Third Parties"); violations as to Dallas office (Appendix B, 404–405).

*§ 806—Harrassment or Abuse:* violations as to Atlanta, Louisville, Boston, Richmond, and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404–405, 406, 407).

*§ 806(2)—Obscene or Profane Language:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 403–404, 406– 407).

*§ 806(5)—Repeated or Continuous Telephone Calls:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 405, 407).

*§ 807(3)—Representation As An Attorney:* violations as to Atlanta, Louisville, Richmond and Seattle offices (see Appendix A); no violations found as to Dallas office (Appendix B, 406–407).

*§ 807(4)—Threat of Arrest or Imprisonment or Garnishment:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); no violations as to Dallas office (Appendix B, 406–407).

*§ 807(5)—Threat to Take Unintended Action:* violations as to Atlanta, Louisville, Boston, Richmond, Seattle and Cleveland offices (see Appendix A); violations as to Dallas office (Appendix B, 404–405, 405–406).

*§ 807(7)—Representations of Debtor Crime:* violations as to Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404).

*§ 807(10)—Deceptive Means to Collect Debt:* violations as to Atlanta, Louisville, Boston, Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404, 407).

*§ 808(3)—Solicitation of Post-Dated Checks:* violations as to Atlanta, Louisville, Richmond and Seattle offices (see Appendix A); no violations as to Dallas office (Appendix B, 406–407).

*§ 809—Validation of Debts:* violations as to Richmond and Seattle offices (see Appendix A); violations as to Dallas office (Appendix B, 404, 405, 407).

In addition, the evidence established "single-office" violations as to *§ 808(1)*—Collection of Interest or Incidental Charges (Boston office); *§ 808(2)*—Failure to Give Notice of Deposit of Post-Dated Check (Richmond office); *§ 808(4)*—Early Deposit of Post-Dated Check (Richmond office); and *§ 806(6)*—Calls Without Meaningful Disclosure of Identity (Seattle office).

## IV. *Training, Discipline, Response to Debtor Complaints*

■ At the conclusion of the first trial, this Court credited the defendant's evidence that "there is no bad faith on the part of the defendant, that they [company management] have taken efforts to comply with the Act." (Appendix B, 408.) This was based upon testimony and exhibits concerning a training program for new collectors about the Fair Debt Collection Practices Act, a policy that collectors had to sign a form agreeing to comply with the Act, etc.

However, *these findings were wrong.* At the second trial, the government established—through credible testimony of ex-employees—that the CAB "training program," except on paper, was really non-existent or ineffective in the regional offices. See Appendix A, 392, 395–396. For example, an ex-employee in the Seattle office (Train) testified that the "test" given to new collectors on the Act was a facade because the general manager of that office actually gave the new employees the correct answers, telling them "to miss a few so it would look legitimate."

In addition, the government proved that the supervisors in the various regional offices knew that debt collectors were violating the Act, but did nothing to stop it. See Appendix A, 390, 392, 395–396. In fact, the evidence even established that some of the CAB supervisors even participated

in many of the violations summarized above. For example, a supervisor in Richmond, in making a collection call, told the female debtor she had better "strap a mattress to her back and hit the street" to make money through prostitution to pay her debt. Appendix A, 393. Indeed, testimony of ex-employees established that this supervisor was actually one of the worst violators of the Act in that office. See also Appendix A, 391–392, 396.

This Court's conclusion after the first trial, that only isolated instances of telephone violations had taken place, was dispelled by the evidence at the second trial. Yet, despite this pervasive practice of violations in the regional office, *not a single employee has ever been disciplined by the defendant for violations of the Act*. After the Dallas trial on August 9, 1984, this Court expressed concern over the total absence of any discipline—noting that something should have been done against the "bad apples" that CAB was bound to have, particularly in view of the turnover in debt collectors (Appendix B, 408–409). Yet, by the second trial over one year later, the defendant still had not fired or reprimanded a single debt collector for violations of the Act. See Appendix A, 388, 390, 392 –393, 394, 395–396, 397–398. Indeed, the government even proved that *the defendant had*—instead of disciplining—*actually promoted some of the debt collectors who were the most persistent violators*. See Appendix A, 15 (Semore and Day in Richmond); 24–26 (Talley in Seattle).

Finally, the evidence was overwhelming that it did absolutely no good for a debtor to complain to the defendant about improper conduct by a CAB debt collector. Often the debtors were not even permitted to talk to the managers of the regional offices; and, when they were, they may have been complaining to one of the supervisors who

were actually participating in—or doing nothing to stop—violations of the Act. See Appendix A, 388, 390, 392–393, 394, 395–396, 397–398. In most instances, it was only after a debtor complained to some state agency that the complaint was sent to the defendant's headquarters in Dallas. Yet, even then, the only response by the defendant to these debtor complaints was that the collectors had done nothing wrong—and the defendant's attorney sent an unbroken string of letters to various state agencies advising them that, upon the basis of his investigation, the debtor's complaint was totally unfounded and that he found no violations of the Fair Debt Collections Practices Act. See, e.g., Govt. Exh. A–162 (the *Grass* complaint in Seattle); Govt. Exh. A–157 (the *Oxley complaint in Seattle*); Govt. Exh. A–222 (the *Watts* complaint in Richmond); Govt. Exh. A–125 (the *Lariviere* complaint in Boston); Govt. Exh. A–81 (the *Williams* complaint in Boston); Govt. Exh. A–185 (the *West* complaint in Louisville).[11]

## V. *Form Letter Violations*

This court's findings concerning the defendant's violations of the Act by the form "dunning" letters which it uses—and which are basically the same throughout its operations (with the exceptions of "attorney letters")—are summarized in Appendix B, 398–403.

■ As stated (footnote 3), *the findings concerning the "CABCO–1" letter was wrong*. Considering the proper legal standard, the "less sophisticated consumer" would understand this letter to be the threat of a lawsuit.[12] See *Jeter v. Credit Bureau*, 760 F.2d at 1172–73. And, just as in the case with the "CABCO–2" letter, there is no intent by the defendant or its customer to actually file suit when it is sent. Consequently, the "CABCO–1" form

---

**11.** As to each of these complaints, this Court has found that they were valid, and that the defendant's collectors did violate the Act in contacts with Grass, Oxley and Greer in Seattle, with Watts in Richmond, with Lariviere and Williams in Boston, and with West in Louisville. Appendix A, 389, 390, 392, 395.

**12.** CABCO–1 states that "Small balance accounts *can be filed* in the Court of Competent Jurisdiction within your state, and the applicable court costs added on."

letter violates §§ 807(5). See Appendix B, 401–402.

Following the first trial, the parties were not able to agree upon revisions to the defendant's form letters. Proposed revisions were submitted to the Court by the defendant, and the government responded to those proposals and filed a motion for reconsideration of certain of this Court's findings. These matters are disposed of in the following manner:

■ *CABCO-2:* The defendant—in response to this Court's comments that the violation could be corrected by revision or by the addition of a disclaimer (Appendix B, 398–399)—proposes to leave the form unrevised, but this disclaimer:

> "We do not mean to represent directly or indirectly that legal action has been, is being, or will be taken against you. We would, however, prefer that the money which is due be paid without necessity of further processing by us." [13]

Upon reflection, the Court concludes that this proposed revision is not adequate. As the government correctly argues, the disclaimer—in this context (unlike that in the *Phoenix* case)—"reinforces the body of the dunning letter, which is violative because it indicates that suit *may* be filed." Consequently, the two offending paragraphs in CABCO-2 must be revised in order to comply with the Act.[14] See *Chrysler Corp. v. FTC,* 561 F.2d 357, 363 (D.C.Cir.1977).

■ *J-2 letter:* The government's motion for reconsideration is denied. As stated in Appendix B(399), this letter does not contain a threat to sue, nor is it a threat to make improper contacts with third parties in violation of the Act.

*J-4 letter:* For the reasons stated as to the CABCO-2 letter, the proposed revision of the "Preparatory Listing For *Referral to Attorney*" letter—by the simple addition

of the "Phoenix disclaimer"—is not sufficient. The form must be revised in order to comply with the Act.

■ *BP-1 letter:* The proposed revision of this letter corrects the problem, and it is acceptable to the government.

■ *T-3 letter:* This letter (Govt. Exh. 173) is a card which states:

> "URGENT
> CALL WITHIN 48 HOURS
> 214/638–5600
> DALLAS, TEXAS
> CALL COLLECT."

Although the use of these forms was discontinued before trial, the evidence did establish that the defendant did send these forms to consumers after the Act went into effect. § 807(11) requires a debt collector to clearly indicate in any communication with the debtor that he is attempting to collect a debt. Government's Exhibit 173 violates the Act, therefore, because it fails to disclose that it was being sent by CAB in an effort to collect a debt.[15]

## VI. *Attorney Letters*

With the exception of the Richmond office, each of the CAB collection offices maintains copies of form "attorney letters," which bear the letterhead of an attorney and have a place for the attorney's signature. The use of these attorney letters may differ somewhat in each of the CAB collection offices, but in each office the collector initially decides when an attorney letter should be sent and has a typist fill in the form with the name and address of the debtor, the amount of the debt, and the name of the client.

§ 803(6)(F) excludes, from the definition of "debt collectors" subject to the Fair Debt Collection Practices Act, "an attorney-at-law collecting a debt as an attorney

---

**13.** This is adopted from the disclaimer language in *United States v. ACB Sales & Services, Inc.,* 590 F.Supp. 561, 567 (D.Ariz.1984), the case to which this Court was referring in Appendix B(399) as "the *Phoenix* case."

**14.** Revision is also required of the offending language which appears in the CABCO-1 letter.

**15.** The government correctly notes that this Court did not rule upon the T-3 letter at the end of the first trial—and that the voluntary cessation of its use does not necessarily mean that injunctive relief is not appropriate. See *United States v. Grant,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

on behalf of and in the name of a client."[16] Following the first trial, this Court concluded that—although the "attorney letters" of T.K. Bamford, a Dallas attorney, did constitute a threat of unintended action, a lawsuit (see Govt. Exhs. 25, 26, 27)—they were exempt from the Act by § 803(6)(F). (See Appendix B, 400–402.) The evidence presented at the second trial, and the government's motion for reconsideration,[17] require a re-examination of the matter of the "attorney letters" used by the defendant.

## (a) *Controlling Principles*

▇▇▇▇ The analysis required must consider both the ethical obligations of the attorney and the limitations placed upon collection agencies by the Fair Debt Collection Practices Act. The controlling principles, therefore, are these:

(1) It is unethical for an attorney to permit a collection agency to prepare and mail dunning letters using the attorney's stationery. ABA Ethics Opinion No. 253 (June 1943); Texas Ethics Opinion No. 160 (Sept. 1957). It is also unethical for an attorney—*without more*—to sign and send collection letters which have been prepared and sent to his office by the collection agency. ABA Ethics Op. No. 253 (June 1943); Texas Ethics Op. No. 160 (Sept. 1957). Obviously, letters of this nature *would not* be exempt from the Act under § 803(6)(F).

(2) What is required by the canons of ethics is that the matter be referred to the attorney *and* that he have the authorization to represent the individual creditor—*not the collection agency*—with respect to each matter. This is also required by the explicit language of § 803(6)(F). Specifically:

(i) The account must have been actually referred to the attorney for collection. ABA Ethics Op. No. 253 (June 1943); Texas Ethics Op. No. 161 (Sept. 1957); Phil.Ethics Op. No. 61–8 (Dec. 1961).

(ii) The attorney must have the *authorization* of the individual creditor to represent it in the collection matter. Phil. Ethics Op. No. 61–8 (Dec. 1961).

... this authorization can be obtained from the creditor by the collection agency on behalf of the attorney. N.Y. City Ethics Op. No. 153 (1930). But *cf.* Wisc.Bar Ethics Op. No. 11 (1961).

... this may be done orally by the collection agency, but the attorney risks unethical conduct if there is not some written evidence of the authority (either from the client or by a confirming letter from the collection agency). *See* Phil.Ethics Op. No. 61–8 (Dec. 1961); Alleg.County Ethics Op. No. 1962–71; Wisc.Bar Ethics Op. No. 11 (1961).

... this authorization *could* be one which merely permits the attorney to send collection letters, but which does not permit the filing of suit without further authorization by the creditor.[18] N.Y. City Ethics Op. No. 153 (1930); Phil.Ethics Op. No. 61–8 (1961); Alleg. County Ethics Op. No. 1963–2.

(iii) The attorney must have sufficient information to satisfy himself that it is proper to send the dunning letter, i.e., he must investigate the merits of the claim before making a demand for payment. Alleg.County Ethics Op. No. 1962–1, 1963–2; ABA Ethics Op. No. 253 (June 1943); Texas Ethics Op. No. 160 (Sept. 1957). This means that a mere list of names of debtors, amounts of debts, etc. is not sufficient; the attorney must have *the file* for review to determine the mer-

**16.** The Act has now been amended, and attorneys are subject to the same requirements as collection agencies under the Fair Debt Collections Practices Act. See Pub.L. No. 99–361, 100 Stat. 768 (1986).

**17.** The government correctly argues that this Court considered only the actions of attorney Bamford, and did not address and continued collection activities of the CAB employees on

the accounts after their "referral" to Bamford. The remarks made by this Court in the last paragraph on page 401 of Appendix B are simply wrong.

**18.** But, here again, the attorney may risk unethical conduct unless he has written evidence of the scope of his authorization.

its of the claim, as well as the limits of his authority.[19] Alleg.County Ethics Op. No. 1963–2.

(iv) There is nothing wrong with the use of form letters, whether prepared by the collection agency or by the attorney. Phil.Ethics Op. No. 61–8 (Dec. 1961); Alleg.County Ethics Op. No. 1962–1. However, the letters must be signed and mailed by the attorney from his office, *not by the collection agency.* N.C.Ethics Op. No. 487 (July 1985); Phil.Ethics Op. No. 61–8 (Dec. 1961); N.Y. City Ethics Op. No. 866 (Jan. 1965).

(3) Although no ethics opinions specifically address the effect of further collection efforts by the collection agency after the matter is referred to the attorney, it is obvious:

(i) That if the attorney merely refers telephone calls or letters from debtors to the collection agency, the matter would not—*in fact*—have been referred to the attorney. It would, therefore, be unethical for the attorney to have sent the dunning letters and they would not be exempt under § 803(6)(F).

(ii) If the collector "makes the decision" as to when subsequent attorney letters should be sent, this also indicates that the matter has not—*in fact*—been referred to the attorney.[20]

(iii) In addition, if the attorney does not handle the telephone calls and correspondence from the debtors, and if he does make the determinations about what should be done in the file, this certainly indicates that the attorney is *really* representing the collection agen-

cy—and that he has no authorization to represent individual creditors. See Wash.Ethics Op. No. 84 (Dec. 1960); N.Y. County Ethics Op. No. 300 (1932). This would mean, just as the government argues, that *the attorney is not "acting as an attorney for the creditor," but is "merely an extension of the CAB collection process,* and his activities do not exempt" the defendant.

(4) Moreover, the conduct of the debt collector after a supposed "referral"—as distinguished from that of the attorney—*is not* exempt from the Act under § 803(6)(F). Therefore, if a collector threatens suit in his activities after an "attorney letter" has been sent, there is a violation of the Act. As the government argues, if this were not so, a collection agency could avoid the Act simply by "referring" the file to an attorney while continuing collection efforts as to that account.[21]

### (b) *Application to Present Case*

 Applying these principles, the Court still concludes that the activities of T.K. Bamford, the Dallas attorney, were exempt under § 803(6)(F). Bamford did have oral or written authority from the creditors to send collection letters;[22] that he did not merely "loan his letterhead" to the defendant, but conducted at least a spot check of the files referred to him; and that all of the letters were signed and mailed from his office.

However, the evidence concerning any further collection efforts by the defendant's employees on the accounts referred to Bamford was not well-developed at the

---

**19.** Indeed, an attorney may risk unethical conduct if he threatens to file suit even though the client is not willing—and has not authorized him—to file suit. Allegheny County Ethics Opinion No. 1963–2.

**20.** Indeed, unless the attorney received an updated file from the agency, he would be unethical in signing and sending these letters without additional investigation and information. Alleg. County Ethics Op. 1962–1, 1963–2; ABA Ethics Op. No. 253 (June 1943); Texas Ethics Op. No. 160 (Sept. 1957).

**21.** The government correctly argues that a collection agency "can escape liability [under the Act] only by terminating its involvement com-

pletely and by turning over the debt to [the attorney] for collection once the first attorney letter is sent, or by returning the debt to the client." ABA Ethics Op. No. 253 (June 1943); Texas Ethics Op. No. 161 (Sept. 1957).

**22.** The government is in error when it asserts that this Court concluded that Bamford had *written* authorization from clients like Def. Exh. 2 in every matter referred to him. To the contrary, the Court found there were few written agreements or referrals, but that authorization had been obtained orally by the defendant on behalf of Bamford. See Appendix B, 400–401.

first trial, no doubt because this issue was not defined until after this Court's ruling. The government now argues that there was "ample evidence [to show] that collectors continued to telephone the debtor and 'work' the account" after the first Bamford letter—and that, because of this, "Bamford's involvement is merely a part of the total collection efforts of" CAB, and not exempt under § 803(6)(F).

■ It is unnecessary to address that argument, however, because the government's evidence at the second trial established flagrant violations of the Act by the defendant in connection with "attorney letters" in other areas.[23] For example, in the Boston office, the general manager testified that *he* approved the first attorney letter; that the typed letters were then stamped with the attorney's signature and mailed from the Boston collection office of CAB; and that the attorney was sent only a listing of the accounts in which an attorney letter had been mailed with the name of the debtor, the client and the amount owed. Clearly, under the principles stated above, these accounts had not been referred to the attorney, and the letters were simply part of the collection efforts of CAB. As the government argues:

"[Once an attorney letter is mailed] and thereafter a CAB collector telephones the consumer, the consumer will naturally discuss that debt with the collector in a context where a threat to file suit had been previously made and received by the consumer. Decisions and collection activities continue to be made by CAB relative to collecting the debt after the first attorney letter is sent. The intertwining of the collection activities of [the attorney] and those of the CAB collector means, in essence, that the threat to file suit is being made by [the attorney] on behalf of CAB. The collection activities that are exempted by the

statute, however, are those of the attorney—not the collection activities of CAB. To hold that [an attorney] may threaten to file suit in a letter signed by [the attorney] that will benefit CAB in subsequent contacts with the debtor clearly subverts the purpose of the Fair Debt Collection Practices Act."

■ Similarly, the general manager of the Atlanta office (James Harris) testified that no debtor files were ever forwarded to the attorney; that the attorney merely received a listing of the name of the debtor and the creditor and the amount due; and that "he comes by the CAB office, reviews the attorney letters, and then mails them" without any other information. The testimony of Harris also established that the defendant's collectors continued their collection efforts on the accounts "referred" to the attorney. Indeed, if the attorney ever got a call from the debtor, he could only refer it to the debt collector because he had no file jacket and no information on the account.[24] Harris also testified, not too surprisingly, that the attorney represented "both CAB and the creditors."

■ Finally, the evidence established that in the defendant's Seattle office the accounts were not *in fact* referred to the attorney; that the collectors decided when the first attorney letter should be sent; that the attorney never took any of the account jackets; that the collectors continued their efforts after the supposed "referral" to the attorney; and that the attorney would refer calls from the debtors to the collectors.

Accordingly, under this evidence, the government has shown consistent and widespread violations of the Act by the defendant in connection with the attorney letters—which make threats of suit, without any authorization to file suit from the client, and with no legitimate exemption

---

23. The evidence also established unethical conduct by the attorney used by the CAB regional offices covered in Appendix A.

24. For some period of time, the Atlanta office used an "attorney letter" form which had the attorney's letterhead (name and address), but *which contained the telephone number of the defendant's regional office* as the purported telephone number of the attorney. See Govt. Exhs. A–60, A–61. In this way, the CAB debt collectors received all of the debtor calls after the "attorney letter" was sent.

under § 803(6)(F). See Appendix B, 401–402.

## VII. *Relief*

### (a) *Scope of Relief*

 The evidence shows a widespread pattern of violations of the Fair Debt Collection Practices Act by the defendant's collectors in their telephone contacts with debtors—including harassing and abusive language, profanity and racial slurs, deceptive threats of suits and other actions, calls at inconvenient times and to the debtor's place of employment, repeated contacts, etc.

Although the evidence concerned only those regional offices discussed in Appendix A and the Dallas office covered in Appendix B, it is proper for this Court—as the government contends—to find that this pattern of misconduct exists in the other CAB offices. *Cf. FTC v. Kitco of Nevada,* 612 F.Supp. 1282 (D.Minn.1985). This finding is supported by the additional facts that:

... the defendant's witnesses testified that practices were established by the Dallas headquarters, and were the same or similar in all regional offices;

... the facts (see § IV) that the supposed training of new CAB collectors was nonexistent or ineffective, that even supervisors and general managers of the CAB regional offices engaged in violations of the Act and condoned improper conduct by employees in their offices, that not a single employee of the defendant has ever been disciplined *in any way* for violating the Act, that even persistent and well-known violators were promoted by the defendant, and that there was no meaningful investigation or response by the defendant to any complaints by debtors about the conduct of debt collectors employed by CAB.

Indeed, *this finding is particularly appropriate because the limitations on discovery and evidence presented at trial were ordered at the request of the defendant*—partly in response to its bitter complaints about the expense of this litigation.[25] Indeed, at the conclusion of the first trial, this Court told the government's attorneys:

"... You have got to restrain your discovery [on the other CAB offices besides Dallas], and you can't go out and take 120 depositions. You are going to be limited and selective in the depositions that you take. You are going to have to [decide upon] one office or another, and I don't need 23 offices. If I get similar testimony on telephone violations from one or two other offices, then I think I would be justified in saying, you know, the practice will therefore probably exist in the others. If I don't, it would not, and it [injunctive relief] would be limited to Dallas." (Appendix B, 412).

The defendant took no exception to this approach. To the contrary, it continued to seek limitations upon discovery and upon the evidence to be presented at trial.[26]

However, since there was evidence of only a single CAB office being involved in a violation of § 808(1) (*Boston*), § 808(2) (*Richmond*), § 808(4) (*Richmond*), and § 806(6) (*Seattle*), the injunctive relief to be granted concerning these violations will be limited to the CAB office involved.

As to the form letter violations, it is undisputed that the basic letters used by the defendant are the same in all regional offices, with the exception of "attorney letters." (See Defendant's Brief in Support of Cross-Motion for Partial Summary Judgment, filed March 18, 1985.) And, for the same reasons discussed in connection with telephone violations, it is proper for this

---

**25.** The defendant had incurred legal fees of over $400,000 when the second trial was completed. See Def. Exh. A–15 (second trial) and Def. Exh. 1, 8 (first trial). The Court does note, however, that it appears that some of this expense was attributable to repetitive, unsuccessful motions for summary judgments filed by the defendant.

**26.** Obviously, if this finding of a widespread pattern of telephone violations is not sustained on appeal because of any claim of insufficiency of the evidence, then this Court will permit the government to take full discovery concerning *all* of the defendant's collection offices—and would reject all efforts by the defendant to place limitations upon discovery or evidence to be presented at any subsequent trial.

Court to conclude that the "attorney letter" violations of the Act exist in all of the CAB regional offices.

Consequently, it is appropriate that the injunctive relief sought by the plaintiff extend to all operations of the defendant, including the CAB headquarters in Dallas and to all of the CAB regional collection offices.

### (b) *Individual Liability*

 The defendant Robert M. Maddin is presently the sole stockholder and the president of CAB. However, there was no evidence presented that he was involved in any violations of the Act or that he knew of any violations by CAB employees. Appendix B, 408. Therefore, the relief granted will apply only to CAB, and not to the defendant Maddin.

### (c) *Injunctive Relief*

 This is, obviously, a case in which injunctive relief is warranted. And, the government correctly argues that the relief "should be broad enough to prevent similar types of violations by CAB to recur in the future." See *United States v. ACB Sales & Service, Inc.*, 590 F.Supp. at 565–66.

 The government also requests special injunctive relief—a requirement that the following notice be included in every collection letter sent to a consumer by CAB:

"The law gives you the right to stop us from communicating with you about this debt, **if you request us to do so in writing.** If you ask us to stop we will. But if you owe the debt, you will still owe it, and your creditor may continue to collect it.

"The collector of debts must comply with the Fair Debt Collection Practices Act, which is enforced by the Division of

27. This "cease communication" notice should also reduce the level of state and federal government involvement required to assure compliance with the Fair Debt Collection Practices Act.

28. Obviously, this notice will also help the FTC in policing the injunctive relief against CAB, which is to be granted in this case. The Court

Credit Practices, Federal Trade Commission, Washington, D.C. 20580."

Under the circumstances of this case— where there has been a widespread pattern of repeated, serious violations of the Act—a notice like this *is* an appropriate, if not essential, remedial measure. The notice informing debtors of their right under the Act to request the CAB debt collector to cease collection activity will be the most effective remedy against oral harassment and other telephone violations (which, by their nature, are very difficult and expensive to prove).[27] Similarly, it is essential that debtors have available the information they need to protect themselves at the time it will do the most good; the notice of the FTC's involvement will enable debtors to make prompt complaints to the FTC if they receive no satisfactory response from CAB when a collector has engaged in violations of the Act.[28]

### (d) *Civil Penalties*

Contrary to the statements made by this Court after the first trial (Appendix B, 403, 408, 411), *this is a case in which civil penalties are warranted.* The evidence at the second trial established a widespread pattern of violations of the Act throughout the CAB regional offices. It also established:

... that the supposed training of new CAB debt collectors was really nonexistent or ineffective;

... that even CAB supervisors and general managers engaged in violations of the Act and condoned them by employees in their regional offices;

... that not a single employee of the defendant has ever been disciplined *in any way* for a violation of the Act;

... that even persistent and well-known violators of the Act were promoted by CAB; and

simply observes that a similar notice by CAB—advising debtors to complain, if necessary, to the Dallas headquarters—would assist CAB in assuring that its debt collectors in the various regional offices do not violate the Act, and that CAB does not violate the injunction in this case.

... that there was no meaningful response by CAB to any complaints it received from debtors or from state agencies about the misconduct of CAB debt collectors.

The government has, indeed, demonstrated that CAB's violations of the Act are widespread, persistent, and systematic—and not isolated instances involving a few "bad apples." (See Appendix B, 408.)

▮▮▮ The civil penalty to be imposed should reflect the seriousness of the violations, must punish the offender, and must provide a deterrent to future violations by the offender and others. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 229, 95 S.Ct. 926, 931, 43 L.Ed.2d 148 (1975). In determining the amount of a civil penalty, this Court is to consider: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate benefits derived by the violations; and (5) the necessity of vindicating the authority of the FTC and deterring future violations. See *United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 967 (3rd Cir. 1981).

▮▮▮ In this case, the defendant CAB cannot correctly claim that it acted in "good faith" in view of the consistent and repeated violations of the Act. The public has been injured, beyond doubt, by these numerous violations; and the likelihood of any substantial number of private suits to redress this injury is remote. Although the defendant has incurred large attorneys fees in this case, and although it does claim to have lost clients and substantial business because of this litigation, CAB does have the ability to pay a civil penalty. It is not possible to determine the benefits actually derived by the defendant from the violations of the Fair Debt Collections

Practices Act. But it is certainly proper to vindicate the authority of the FTC in this case so as to deter future violations of the Act by CAB and by others.

▮▮ Considering all of these factors, the Court concludes that a civil penalty of $150,000.00 is appropriate in this case.[29]

## CONCLUSION

In accordance with this Memorandum Opinion:

1. The defendant Central Adjustment Bureau, Inc., its subsidiaries, and its officers, agents, and employees, and its successors and assigns (hereinafter referred to as "defendants"), in connection with the collection of a "debt" from a "consumer" as those terms are defined in Sections 803(3) and 803(5) of the Fair Debt Collection Practices act ("Act"), 15 U.S.C. §§ 1692a(3) and (5), are permanently enjoined and restrained from:

(a) Mailing, delivering or causing the delivery of a letter to a consumer which contains a direct or implied representation that a consumer's failure to pay the debt will cause the consumer to be subject to legal action, including but not limited to the filing of a law suit, (i) when at the time such representation is made defendants do not have authority from the creditor to file suit or take the stated or implied legal action; or (ii) when, at the time such representation is made either the defendants or the creditor have not reached a decision to take the stated or implied legal action.

(b) Representing orally, directly or by implication, that a consumer's failure to pay the debt will cause the consumer to be subject to legal action, including suit, or cause the consumer's debt to be reduced to judgment when, at the time the representations are made (i) defendants do not have authority from the creditor to take that

---

**29.** The government correctly argues that each use of an improper dunning letter, and each telephone violation by a CAB collector, represents "a separate and distinct violation subjecting CAB to a maximum civil penalty of $10,000 per violation." See *United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, at 967–69 (affirming a $1,750,000 penalty imposed by the district court). This Court does not feel that $10,000 for each of the thousands of letter violations, or each of the numerous telephone violations, is appropriate. However, should there be any contempt proceedings filed because of subsequent violations of the injunctive relief to be granted in this case, this Court—for deterrent effect—will consider a much more substantial penalty.

particular legal action; or (ii) either the defendants or the creditor have not reached a decision to take such legal action at the time the representation is made;

(c) Using, preparing or mailing a letter on the stationery of an attorney unless the account has been referred to the attorney for further handling *and* unless the defendants cease all further collection efforts on that account;

(d) Making telephone calls to any consumer at the consumer's place of employment after being requested orally *or* in writing by the consumer, or by the consumer's employer, not to call at the place of employment;

(e) Making telephone calls to any consumer prior to 8 o'clock a.m. at the consumer's local time or after 9 o'clock p.m. at the consumer's local time or at any other time that defendants know or should know are inconvenient to the consumer;

(f) Making telephone calls to any person in such a manner as to harass, oppress, or abuse, or abuse such person at the called number including, but not limited to: (i) threatening that credit would be ruined; (ii) threatening that the person will be in trouble; (iii) using obscene or profane language; (iv) using abusive and demeaning language, including, but not limited to, language suggesting that the consumer is a criminal, or that the consumer should not be allowed on the streets; or (v) placing repetitious or continuous phone calls to consumers;

(g) Communicating with any person other than the consumer, except as provided in § 804 and § 805(b) of the Act;

(h) Making false representations or implications orally or in writing, (i) that any individual is an attorney or that any communication is from an attorney; (ii) that nonpayment of any debt will result in the arrest or imprisonment of any person, or the seizure, garnishment, attachment, or sale of any property or wages, except as provided in § 807(4); or (iii) that the consumer has committed any crime;

(i) Using any false representation or deceptive means to collect or attempt to collect any debt;

(j) Soliciting any post-dated check for the purpose of threatening criminal prosecution;

(k) Failing to disclose in all communications made to collect a debt, or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that the information will be used for that purpose;

(*l*) Collecting any amount (including interest, fees, charges or expenses incidental to the principle obligation) unless that amount is expressly authorized by the agreement creating the debt or permitted by law [*applies only to the defendant's Boston office*];

(m) Failing to give notice of a post-dated check without notice to the consumer not more than ten nor less than three business days prior to such deposit [*applies only to defendant's Richmond, Virginia office*];

(n) Depositing or threatening to deposit any post-dated check prior to the date on such check [*applies only to defendant's Richmond, Virginia office*];

(o) Placing any telephone calls covered by the Act without meaningful disclosure of the caller's identity [*applies only to defendant's Seattle office*];

(p) Failing to cease collection efforts: (i) after being notified by the consumer of a dispute in accordance with 809(b) of the Act; (ii) after the debt has been paid; or (iii) after the consumer has made payment arrangements directly with the creditor.

2. The plaintiff is awarded monetary civil penalties from the defendants for the past violations of the Act in the amount of $150,000.00.

3. The defendants shall disclose in writing, in a clear and conspicuous manner, the following notices on each written statement sent to consumers in connection with the collection of a debt:

"The law gives you the right to stop us from communicating with you about this debt, if you request us to do so in writing. If you ask us to stop we will. But

if you owe the debt, you will still owe it, and your creditor may continue to collect it.

"The collector of debts must comply with the Fair Debt Collection Practices Act, which is enforced by the Division of Credit Practices, Federal Trade Commission, Washington, D.C. 20580."

4. The defendants shall revise its form letters to comply with this Final Judgment, and with this Court's Memorandum Opinion, within ninety (90) days from the date of entry of this Judgment.

5. The defendants shall give written notice of the provisions of this Final Judgment within thirty (30) days from the date of its entry to each of their officers, agents, employees, attorneys, successors or assigns, and to each person who now or in the future assists or participates with the defendants in the collection of a debt. The defendants shall also file an affidavit of compliance with this Court, with a copy to the Federal Trade Commission, Division of Credit Practices, Washington, D.C., within thirty (30) days of the date of entry of Final Judgment stating the fact and manner of compliance with this paragraph, and identifying the names and positions of all persons to whom notice was given.

6. The defendants, for a period of six (6) years following the date of entry of Final Judgment shall maintain, and make available to the Federal Trade Commission for inspection and copying upon request, all form letters used by defendants in connection with any collection activities.

7. The defendants shall for a period of six (6) years following the entry of this Final Judgment, notify the Federal Trade Commission, Division of Credit Practices, Washington, D.C., at least ten (10) days before any changes such as dissolution, assignment or sale resulting in the emergence of a successor corporation, the creation, or dissolution of subsidiaries, or any other change in the corporate structure of Central Adjustment Bureau, Inc., that may affect compliance obligations arising out of this Order. Defendants are not required to provide such notice when the proposed change will result only in changes in connection with the opening or closing of an office in the ordinary course of business and will effect no other change in the corporate structure, but defendants are required to notify the Federal Trade Commission, Division of Credit Practices on an annual basis when such changes have occurred. Defendant shall provide such notification at the end of every calendar year following the entry of this Final Judgment for a period of six (6) years.

8. This Court retains jurisdiction for the purpose of enforcing or modifying this Final Judgment, and for the purpose of granting such additional relief, or enforcing this Judgment by contempt proceedings, as may be necessary.

## APPENDIX A

SPECIFIC FINDINGS OF FACT—UNITED STATES v. CENTRAL ADJUSTMENT

| | | |
|---|---|---|
| I. | Atlanta | 387 |
| II. | Louisville | 389 |
| III. | Boston | 390 |
| IV. | Richmond | 392 |
| V. | Seattle | 395 |
| VI. | Cleveland | 398 |

### I. Atlanta

I specifically find that Central Adjustment Bureau is liable for violations of the Fair Debt Collection Practices Act for actions taken in its Atlanta office. In so finding, I credit the testimony of debtors Joyce Gilchrist, Joyce Brown, Paula Pearson, and Martha Watson. These debtors had either paid their debts or were paying their debts, and had little to gain through their testimo-

ny. I do not, however, credit the testimony of the witnesses offered by Central Adjustment, including James Harris, Bob Adcock, and Don Goodwin, whose testimony was contradictory and whose interest in the outcome of the case was overwhelming.

Among the offenses established by the testimony in this trial are the following:

## A. Section 805(a)(1)—inconvenient calls

The testimony of Joyce Gilchrist establishes that the witness was called at 7–7:15 a.m. on a Saturday morning. I find that Ms. Gilchrist's testimony was credible; she had paid two of her loans in full, and owed only $325 on her last loan. I do not find that the general denials of Don Goodwin, the collector who worked Ms. Gilchrist's account, were credible.

I also credit the testimony of Joyce Brown, who established that she had been called in 1984 before 8:00 a.m.

## B. Section 805(a)(3)—calls to place of employment

I credit the testimony of Paula Pearson, who established that a collector called her at her place of employment after she requested in writing that he not call her at work. The collector, in fact, asked at speak to her supervisor at the bank at which she worked. I do not credit the testimony of Don Goodwin, the collector for Ms. Pearson, who generally denied all of Ms. Pearson's testimony; in testifying about a check that had been returned to the debtor, he testified that he "would not have sent the check back to her, no sir," even though his account jacket indicated that he had done so.

## C. Section 805(b)—communications with third parties

Joyce Brown established that a collector called her home and spoke with her grandmother several times and asked the grandmother if the debt would be paid. In fact, the contact with the grandmother is corroborated by the account jacket kept by Central Adjustment, which stated: "Spoke with mother ... mother now aware of loan repay problem." Collector Bob Adcock admitted speaking with the grandmother, but denied informing her of the loan; this testimony is directly contradicted by the information Adcock wrote on the account jacket.

Paula Pearson established that a collector spoke to her roommate about her account.

## D. Section 806—harassment or abuse

Joyce Gilchrist testified that she was called a liar, and that the collector stated that "he doesn't know why they let people like me go to school in the first place." In addition to this egregious racial slur, Ms. Gilchrist also established that the collector yelled at her over the phone.

Paula Pearson also testified to a collector yelling over the phone. She testified that a collector claimed he could cause her to lose her job at the bank; his conduct so upset her that she did, in fact, notify her supervisors of her problems with the collector. Her testimony establishes abusive and threatening behavior on the part of a collector.

Joyce Brown testified that a collector claimed she would be "dragged to court like a common debtor." She also testified that the collector stated, "I don't know why they lent you the money anyway."

## E. Section 806(2)—obscene or profane language

Joyce Gilchrist testified that a collector called her a "god damn liar," and used other profane language against her.

Martha Watson, in a sworn declaration, stated that a collector swore at her several times and called her a "low-lying bitch" and a "low-down son of a bitch" on several occasions.

I do not find credible the testimony of James Harris, the manager of the Atlanta office, that he has "absolutely not" ever heard profanity used in his office and that he has never heard of a collector raising his voice. I reject his testimony not only on the basis of credibility, but of relevance—Harris admitted that he only overhears employees sporadically.

**F. Section 806(5)—repeated or continuous calls**

Paula Pearson testified that she was called repeatedly at work, after she requested in writing that she not be called at work.

**G. Section 807(3)—representation as an attorney**

Joyce Gilchrist testified that a collector told her he was with the legal department at Central Adjustment Bureau, representing Benedict College.

**H. Section 807(4)—threat of arrest or imprisonment**

Both Joyce Gilchrist and Paula Pearson testified that they were threatened with garnishment.

**I. Section 807(5)—threat to take unintended action**

Joyce Gilchrist testified that a collector stated that he could sue her; Paula Pearson testified that a collector stated he could cause her to lose her job and that he would garnish her wages; Joyce Brown testified that a collector stated he would "drag her to court."

**J. Section 807(10)—false and deceptive means**

Joyce Gilchrist testified that the collector stated he was with the "legal department," and Paula Pearson testified that the collector claimed he would cause her to lose her job.

**K. Section 808(3)—solicitation of post-dated checks**

Paula Pearson testified that a collector solicited post-dated checks from her.

**II. Louisville**

I also find that Central Adjustment Bureau is liable for violations of the Fair Debt Collection Practices Act for actions taken at its Louisville office. I find that the testimony of the debtors from this office was exceptionally credible, as both the Wests and the Renfros had paid off their debts entirely—indeed, the Renfros had paid off their debts before Central Adjustment began working their accounts—and none of the debtors had anything to gain by their testimony. I also credit the testimony of Randy Hutchinson, a client creditor, who testified that his client would litigate only in the case of flagrant violations. The offenses that have been established are the following:

**A. Section 805(a)(3)—calls to place of employment**

Both Howard and Nancy Renfro testified that a collector called Ms. Renfro at work, even though she requested that she not be called at work because her job would be endangered. In fact, she testified that the collector wanted to speak to her boss, to "tell him the type of person he has working for him."

**B. Section 805(b)—communications with third parties**

The above conduct also establishes a violation of this section.

**C. Section 806—harassment or abuse**

Both Everett and Betty West testified convincingly of numerous instances of abuse. Mr. West was referred to by a collector as a "deadbeat" and a "crook;" the collector stated that "it was crooks and people like us that give credit a bad name." Mrs. West testified that a collector stated that Central Adjustment would put them both in jail, and take their home and car.

Mr. Renfro testified that the collector calling them was "very belligerent," threatened him and his wife, and upset his wife to the point of tears. Mr. Renfro testified that the collector kept calling even after he sent cancelled checks to Central Adjustment to prove that the debt had been paid. Mrs. Renfro testified that she had just come home from surgery, and continued to receive 12–15 harrassing calls per week. During one call to Mrs. Renfro at work—after she had asked not to be contacted there—the collector stated that "by the time I get finished you are going to need three jobs."

### D. Section 806(2)—obscene or profane language

Mr. Renfro testified that the collector used profanity, including demanding that Mr. Renfro "pay this damn bill."

### E. Section 806(5)—repeated or continuous calls

Both Mr. and Mrs. West testified of repeated calls that were "basically all the same thing, except that they kept getting a little meaner, a little bit more harrassment, a little more threatening." Similarly, Mr. and Mrs. Renfro testified that calls continued after they had requested that they cease, both to home and work telephones. The Renfros testified that they received 12–15 calls per week, even when the collector had acknowledged receipt of proof that the underlying debt had been paid in full.

### F. Section 807(3)—representation as attorney

The collector calling Mrs. Renfro represented himself as a "consumer law expert" and stated that he "knew the law."

### G. Section 807(4)—threat of arrest or imprisonment

Mrs. West was told that Central Adjustment could have them put in jail, and take their home and car. The Wests were threatened with suit, and the collector told them she could ruin their credit. The Wests and Renfros were threatened with garnishment.

### H. Section 807(5)—threat to take unintended action

Both the Wests and the Renfros received repeated threats of suit and garnishment, which I just described.

Diane Greene was threatened with suit, even though the client creditor to which she owed the underlying debt had authorized suit only in egregious cases and "friendly" suits against estates.

### I. Section 807(7)—representations of debtor crime

Mrs. West was told that she and her husband could go to jail if the debt was not soon eliminated.

### J. Section 807(10)—deceptive means to collect debt

The collector calling Mr. West told him that she could ruin his credit.

### K. Section 808(3)—solicitation of post-dated checks

Even after the Renfros had sent the collector handling their account proof that their debt had been paid in full, the collector "wanted me to post-date him checks. He couldn't wait for the money. . . . He wanted his payment now."

### III. Boston

I find that violations of the Act have also occurred at the Boston office of Central Adjustment. In so finding, I credit the testimony of the debtors Nancy Munise, Claire Cassani, Dorothy Lariviere, and Janice Williams. Ms. Munise was especially credible, as her debt has been entirely eliminated and she has no vested interest in the subject of her testimony. Ms. Cassani also had no ax to grind, as the small debt that was the subject of her contacts with Central Adjustment was paid before Central Adjustment attempted to collect it. The other debtors, similarly, have resolved their credit difficulties, and are making payments on their debts.

I do not, however, find the testimony of Gary Dishman credible. His demeanor while testifying was evasive, and his general denials of any misconduct were unconvincing at best. I credit the testimony of Allan Roth insofar as it establishes that the blame for violations established by the debtor testimony should be shouldered by the management of Central Adjustment as well as the individual collectors. Roth testified that "can hear all conversations from our side" when supervising his collectors, except for a 15– to 30–minute period each day. Moreover, Roth established that only two collectors had ever been disciplined by him—one was fired for not producing enough income, and another, Dishman, was disciplined for having excessive absentee-

ism. The violations for which the company is responsible in Boston are these:

### A. Section 805(a)(1)—inconvenient calls

Claire Cassani testified that she was called before 8:00 a.m. several times, and that the collector said he would call her early again —"that was his right to do as he wanted to do." Janice Williams testified that she received one call at 7:45 a.m. Nancy Munise testified that she received calls at 7:00 a.m. and at 9:00 p.m. Dorothy Lariviere testified that she was called at 7:45 a.m.

### B. Section 805(a)(3)—calls to place of employment

Ms. Williams testified that she told a collector not to call her at work, but that he persisted in doing so. Her supervisor wrote to Central Adjustment—and the letter is in evidence—complaining that the collector persisted even though personal calls were not allowed and the calls interfered with Ms. Williams' ability to do her job effectively. She received up to five calls at work in one day.

### C. Section 805(b)—communications with third parties

Ms. Cassani testified that a collector called both her father and her brother; the collector attempted to find out from them if Ms. Cassani owned a car, the plate number, and the name of her bank. Ms. Munise testified that a collector talked to both her father and her stepmother.

### D. Section 806—harassment or abuse

Ms. Munise testified that she was called a liar; the collector asked "why should we believe you?" Ms. Cassani testified that the collector had a "very nasty attitude," and referred to her as "honey," "babe," and "sweetheart." Ms. Lariviere testified that the collector was "nasty but tolerable" at the outset, but became worse—he yelled "all kinds of threats and accusations" at her, and called her irresponsible. He was not deterred by the fact that she was eight months pregnant; rather, he stated that she "shouldn't be pregnant if [she owed] that much money out." Ms. Williams testified to being threatened and harassed, and was disturbed by the collector's conduct to the point of seeking psychological care.

### E. Section 806(2)—obscene or profane language

Ms. Cassani testified that a collector called her a "bitch," and said that "it's people like you [that] screw up the world because you don't pay your bills." He also said that he "didn't give a shit about my bills." Ms. Williams testified that a collector said the judge who would handle his suit against her "didn't give a fuck" about her situation.

### F. Section 806(5)—repeated or continuous calls

Ms. Cassani was called more than once in a day; Ms. Williams was called five times in one day at work, and three more times at home; Ms. Munise was called seven times in two months and her relatives were called 12 times.

### G. Section 807(4)—threat of arrest or imprisonment

Ms. Munise testified that she was told Central Adjustment would attach her car, home, and salary. Ms. Williams was told that her wages and property would be attached. Ms. Lariviere was told that Central Adjustment would take her husband's wages, as well as their furniture and car; she was also told that she "could be hauled off to jail." When she told the collector they did not own anything worth $3,000, he replied: "Well, we'll have to take a lot of things, then, won't we?" Ms. Cassani was told Central Adjustment would attach her property, car, and assets; a collector said "he was putting a warrant out for my arrest."

### H. Section 807(5)—threat of unintended actions

Ms. Cassani was threatened with suit seven to 10 times, and was sent attorney letters; this action was taken despite the fact that the collector, Gary Dishman, knew that his

client had specifically stated that it would not sue Ms. Cassani. She was also told that she would be responsible for all of Central Adjustment's attorneys' fees and costs. Ms. Lariviere was threatened with suit more than once. Ms. Williams was also threatened with suit, as was Ms. Munise. Indeed, Ms. Munise was told that "the sheriff would be notifying me with papers," and was also told that Central Adjustment would ruin her credit.

### I. Section 807(7)—false representation of crime

Ms. Cassani was told that the collector was putting out a warrant for her arrest, as was Ms. Munise. Ms. Lariviere was told that "it was a crime not to pay your bills."

### J. Section 807(10)—deceptive means to collect debt

Each Boston debtor testified of claims of attachment. Ms. Munise also testified that the collector claimed he would ruin her credit.

### K. Section 808(1)—collection of interest or fee

Ms. Cassani was threatened with a $150.00 late fee, and told that she would be responsible for all of Central Adjustment's legal fees and costs in pursuing her debt in court.

### IV. Richmond

Numerous violations of the Act were also established involving the Richmond office of Central Adjustment. In so finding, I credit not only the testimony of the debtors, but that of the ex-employees. Of the debtors, Peter Quinn, Cherle Watts, Edith Harvey, and Jacqueline Dean had paid their debts in full; indeed, Judith Adams' debt had been paid in full before Central Adjustment attempted to collect it. Gay Floyd's debt was deferred, and Sharon Taylor's debt is in the process of being paid. None had an incentive to lie, and each supplied testimony that was both internally and externally consistent.

The ex-employees were also worthy of belief, especially Joseph Pazera, who col-

lected for less than a month and left the employ of the company amiably. Although Patricia Diggs, John Mills, and Donald Litten had conflicts with Central Adjustment, I do not find these conflicts sufficient to damage seriously the consistent and convincing nature of their testimony.

The testimony of the current Central Adjustment employees, however, is not worthy of complete belief. Dale Semore had an evasive and uncooperative demeanor while testifying, even under questions from the Court; beyond these difficulties in credibility, Semore testified that he had no independent recollection of the majority of facts to which he testified. Robert Smith's testimony was also less than credible. It is simply beyond belief that the Central Adjustment collection operation was as squeaky clean as Smith portrayed it, in light of the overwhelmingly consistent testimony from both debtors and ex-employees.

In this connection, it is relevant to state the nature of management discipline and training apparently carried out at the Richmond office. Testimony in the trial established to the Court's satisfaction that violations of the Act were not the product of a few renegade collectors, but were sufficiently tied to management to justify the imposition of penalties against the Company itself. For example, Litten, an ex-employee, testified that he received no manual or testing on state and federal law until after six weeks on the job. His training consisted of observing Semore make calls for one day and being instructed in several "talk-offs." Litten also testified that Smith did caution collectors in the use of the term "deadbeat" and told them to use terms such as "we *may* sue" or "we may *recommend* suit." Smith also stopped several collectors from stating they were attorneys. Others testified, however, that Smith was fully aware of all of the transgressions committed by his collectors, and that the scope of his discipline consisted of saying "c'mon, you can't say that." In fact, a persistent offender, Brad Day, was actually promoted before being fired for

apparently embezzling money from the company.

Pazera, Mills, and Diggs, all former employees, testified that both Smith and Semore knew of the violations because both managers participated in violating the Act themselves. Pazera testified that Semore was one of the worst violators, as did Diggs and Mills. Perhaps the most egregious example of a Section 806 violation is directly from Semore, who told a woman to "strap a mattress to her back and hit the street" to make the money she owed. Debtor Jacqueline Dean testified that she spoke with Smith, and that Smith supported his collector to the point of stating that "what he says goes." The evidence supports a finding that Central Adjustment has created an atmosphere that is conducive to continued violations of the act, including:

### A. Section 805(a)(1)—inconvenient calls

Ms. Dean testified that she was called as early as 7:15 a.m. and as late as 10:30 p.m. Ms. Watts testified that she was called before 8:00 a.m. Ex-employee Litten testified that collectors began calling at 7:00 a.m. for a period of weeks when collections were down and extra collection efforts were made.

### B. Section 805(a)(3)—calls to place of employment

Debtor Quinn testified convincingly that a collector continued to call him even after Quinn told him it would cost him his job if the calling continued; the calling continued even after Quinn had sent a registered letter requesting that the calls cease. The collector also abused Quinn's supervisor and co-workers, as established by Quinn's testimony and his letter to Central Adjustment. Ms. Adams also requested that she not be called at the office, to no avail; Ms. Harvey made a similar request.

These practices were corroborated by ex-employees. Litten testified that he did not honor debtor requests not to be called at work. Mills, similarly, testified that collectors would continue to call debtors at work unless they had a "certified letter" demanding that no further calls be made. Both Mills and Pazera used the tactic of threatening to call debtors at work to intimidate them into committing to payment. Mills testified that this tactic was especially useful with military and police officers, who would be asked, "what would happen if your commanding officer heard of this?"

### C. Section 805(b)—communications with third parties

Threatening contacts with employers also establishes violations under this section. Mills also contacted debtors' neighbors, as did Litten. Debtor Quinn's daughter and neighbor were both contacted by a collector. Ms. Watts testified that her parents were told not to try to "hide" her, and that she would go to jail if she didn't make payments. Perhaps the most creative and egregious third-party contact was made by Ms. Floyd's collector, who convinced Ms. Floyd's mother that her daughter's grades would be revoked if the mother did not pay the $400 debt immediately. This third-party contact is conclusively established by the fact that the mother paid, and the fact that the sum was subsequently refunded by Central Adjustment and Memphis State University.

### D. Section 806—harassment or abuse

Ms. Watts testified to the collector's "abusive" and "insulting" behavior, and reported racial slurs—the collector stated that "you people think that you can get a free ride in society," clearly referring to blacks. Ms. Dean testified that she was so intimidated and frightened by a collector's threats that she was left crying after more than half his calls. Ms. Harvey testified that her collector was "real nasty," and that he was screaming into the phone. Quinn testified that a collector yelled at him, and was abusive to him and his co-workers; the collector also called his wife a crook. Ms. Floyd's mother was threatened with the prospect of her daughter's college credits being revoked. Ms. Dean was called an idiot by a collector, and Ms.

Adams was told the collector had orders to take her to court.

Violation of this section are also established by testimony of the ex-employees. Litten testified that Semore was loud and abusive in his attempts to humiliate debtors, and that he would often hang up on debtors by slamming the phone down. Mills testified to a unique racial slur that was corroborated by Ms. Diggs—that Smith stated to a black collector that "you call each other 'brother' because you don't know who your father is."

### E. Section 806(2)—obscene or profane language

Quinn testified that his receptionist would be asked where the "hell" he was; Ms. Dean testified that she was asked who the "hell" she was and called a "bitch." Ms. Harvey testified that a collector stated that all he wanted was the "damn" money. Each ex-employee testified to profanity being often used around the office, belying Smith's testimony of an aurally pristine atmosphere. Pazera established perhaps the most complete list of expletives, including "damn," "hell," "asshole," "shit," and "maybe fuck."

### F. Section 806(5)—repeated or continuous calls

Ms. Adams and Quinn testified that calls continued after the collectors were told to stop; Ms. Dean testified to receiving four to five calls in a single day. Litten testified that some debtors were called daily to wear them down, and successive calls in a single day were used. Mills testified that collectors often called repeatedly, especially after a debtor had abruptly hung up. Ms. Diggs also testified to this tactic of repeated calling, as did Pazera.

### G. Section 807(3)—representation as attorney

Litten testified that collectors often represented themselves as attorneys until Smith halted the practice; even after, however, collectors represented themselves as being from the "legal department" or as "legal mediators."

### H. Section 807(4)—threat of arrest or imprisonment

Ms. Watts testified to threats to garnish her paycheck; Quinn testified to threats to garnish his salary and take his property; Ms. Taylor testified to threats of garnishment and ruination of her credit; Ms. Dean was told she could go to jail and have her car and house taken away. A collector told Ms. Harvey that he would "issue a judgment" against her. Ms. Adams was told the collector "had orders" to take her to court.

Ms. Diggs testified that collectors often told a debtor they'd see them in court, or that "your next contact will be from the sheriff's department." She also testified that threats of garnishment were made "rather often." Pazera testified that threats of jail and garnishment were common, as did Mills and Litten. Mills also testified that he often stated that someone would call on debtors with an arrest warrant.

### I. Section 807(5)—threat to take unintended action

Quinn was threatened with suit by a collector, as was Ms. Adams. Ms. Harvey was told that Central Adjustment could take a judgment against her. Ms. Dean was told she would be sued by Central Adjustment.

Litten testified that threats to sue were often made by all collectors, and that "legal talk-offs" existed. These threats were made even when clients expressly stated they would not sue. He stated that it was virtually impossible to collect a debt unless the debtor "had some fear of legal action." Litten also threatened to turn an attorney-debtor in to Martindale-Hubbel. Ms. Diggs testified that threats of legal action were often made, and that instructions from clients that would not sue were ignored; indeed, Ms. Diggs had an ideal vantage point to view this process, as her job involved fielding complaints from client-creditors who were the subject of complaints arising from unfounded threats to sue. Pazera testified that suit was often threatened—even against debtors whose creditor

would not sue—although suit was "hardly ever" recommended. Mills also stated that threats to sue were commonplace.

### J. Section 807(7)—false representation of crime

Ms. Watts testified that she was told she would go to jail; in fact, the collector told her parents that she could be jailed for her debts. A collector implied to Quinn that "it was a criminal offense not to pay your debts." Ms. Floyd was told that non-payment of her debt was against the law, and that if she didn't pay the money she would be arrested. Ms. Dean was told that if she didn't pay her debt within seven days, she would be "sent to jail" and the collector would "send the sheriff out" after her.

### K. Section 807(10)—false and deceptive means

Two examples suffice under this section. First, Ms. Floyd was told she wouldn't finish school if the full amount wasn't paid; this ruse was sufficient to compel Ms. Floyd's mother to pay her debt in full. Ms. Harvey was threatened, in writing, with prosecution for her use of state envelopes in corresponding with Central Adjustment. The collector wrote, "you should be aware that using state stationary is a violation of state law and these envelopes could be turned over to the attorney general's office."

### L. Section 808(2)—depositing checks without notice

Quinn testified that a post-dated check Central Adjustment solicited from him was deposited without notice.

### M. Section 808(3)—use of checks to threaten prosecution

Litten testified that he would solicit post-dated checks expressly in hopes that one would not clear and thus provide him with a tool against a debtor; he stated that "a bad check is a pretty forceful thing to use against someone." Mills testified that he—and other collectors—would threaten to prosecute a debtor on a bad check charge.

### N. Section 808(4)—depositing checks prior to due date

Litten testified that he once deposited a check early even though the debtor had warned him he had insufficient funds, and that Smith had approved this procedure.

### O. Section 809—validation of debts

Ms. Floyd testified that a collector refused to check the status of her student deferral; Ms. Dean testified to a parallel refusal to check the status of her teaching deferral. Ms. Adams testified that her bill had been paid from the beginning, but that the collector refused to verify its status.

### V. Seattle

Violations have also been established for the Seattle office of Central Adjustment. In so finding, I credit the testimony of the debtors and ex-employees called by the government. None had any reason to testify falsely. Jo Ann Gress has paid the $19.50 debt Central Adjustment attempted to collect; Martha Anni Walls and Deola Lebron owed no money; Betty Oxley has had her debt terminated due to her disability; and Sylvia Cavazos never, in fact, owed her debt for a library fine. Richard Lee Greer's testimony was also consistent with that of the other debtors; although he had several convictions, none was for a crime involving dishonesty or false statement. Former employees Sheri Anne Cole and Ralph Edward Train were also convincing, and lacking in any reason to lie. Also convincing in establishing violations was the testimony of Colleen Francis Knox, a former client creditor, who testified that her employer refuses to use Central Adjustment because of the complaints it received.

The current employees called by the defendant, in contrast, were unconvincing in demeanor and testimony, and had ample motivation to testify falsely. Donald Lusk's testimony was unbelievable in that he consisted in portraying the collection operation as an incredibly pristine one in which no one but debtors raised their voices; his testimony that only one formal

complaint had been received was directly contrary to the testimony of Ms. Knox, who testified to the receipt of several complaints dealing only with her employer. Of the two, I find Ms. Knox to be the more credible witness. Sheralyn Norris, a collector, admitted to two violations of the Act— first, in stating that "I may have threatened to sue" a debtor, and, second, in admitting that she may have threatened to harm a debtor's credit rating and stating that "we do have [that] capability." James Perry, another collector, attempted to establish an illogical version of contacts with debtor Jo Ann Gress; he testified that Ms. Gress stated she would move "again" to escape the collector's efforts when she had only moved one block in the first place. His version of the contact with Ms. Gress' daughter is similarly incredible. The testimony of Jolaine Talley, another collector, was seriously damaged by the testimony of the former employees. In short, the defendant's witnesses were simply less credible than the government's witnesses. The latter witnesses established these violations:

### A. Section 805(a)(1)—inconvenient calls

Ms. Oxley testified that she was called at 7:30 a.m.; I find this testimony extremely credible, as it is corroborated by a contemporaneously written note (exhibit 155) made before the debtor became aware of the Act.

### B. Section 805(a)(3)—calls to place of employment

Ms. Cole testified that such calls were commonplace among collectors; she reported receiving one call in which a debtor said he had received four calls at work and would be fired if they did not cease.

### C. Section 805(b)—communications with third parties

Ms. Cole also testified that it was relatively common for collectors to speak with third parties; one incident she reported involved a collector telling a babysitter that he was calling to collect money. Ms. Cavazos tes-

tified to receiving a threat to be called at work; Ms. Gress testified that a debtor talked to her 12–year–old daughter in an attempt to gain information. Greer testified that a collector had called his brother in California. The most egregious violation, however, was the repeated conversations a collector held with Ms. Walls, the mother of Ms. Lebron, that led Ms. Walls to pay the underlying debt. Both women testified to this contact and the payment of the debt corroborates their testimony.

### D. Section 806—harassment or abuse

Ms. Cavazos testified to an offensive racial slur; a collector told her not to put off payment until "'manana,' because isn't that what all my people did anyway, put things off until manana?" The same collector also exhibited "abusive" behavior, including shouting and calling the debtor "dumb." Ms. Oxley testified that a collector was "hateful" to her on the phone, and that she was upset to the point of tears during his calls. Greer testified that the collector was "nasty" and called him a "deadbeat" and a "flake." Ms. Gress testified that the collector was "really rude" and told her she would "never weasel out of this bill again." Ms. Lebron testified the collector was "rude" and tried to intimidate her and her mother.

These violations are supported by the testimony of former collector Train, who testified that debtors were called demeaning names such as "stupid, idiot," and "deadbeat." Indeed, he testified that Jolaine Talley, a collector who testified, was among the worst offenders and was rewarded with a promotion to collection manager.

### E. Section 806(2)—obscene or profane language

Greer testified that a collector stated she was "tired of this shit" in demanding payment. Cole testified that collectors often used profanity; one of those she observed was Ms. Talley. Among the terms she heard used were "God damn," "son of a bitch," "asshole," "damn," "hell," and "fuck."

### F. Section 806(5)—repeated or continuous calls

Both former employees, Train and Cole, testified that repeated calls were made; such calls could be overheard because the collector would immediately reference the previous disconnected conversation.

### G. Section 806(6)—calls without disclosure of identity

Ms. Gress testified that a collector did not identify himself as being from Central Adjustment. Train testified that collectors would often call the personnel offices of a debtor's employer to feign garnisheement without identifying themselves.

### H. Section 807(3)—representation as attorney

Ms. Oxley testified that a collector characterized himself as an assistant to an attorney, even though he could not explain why the attorney's office had not heard of him. The collector calling Ms. Lebron and her mother, Ms. Walls, represented himself as an attorney several times. The representation was evidently convincing enough to influence Ms. Walls to pay the bill on behalf of her daughter.

Ex-collector Train testified that collectors would often represent themselves in various legal capacities, such as "legal advisor," "legal reviewer," "legal assistant," or "with the legal office of CAB."

### I. Section 807(4)—threat of arrest or imprisonment

Ms. Oxley testified that a collector told her he would come out and "take her car." Ms. Cavazos testified that a collector claimed the "legal department" would "serve a warrant and arrest [her] at work and create a scene." Ms. Gress testified to threats of garnishing her check, and Greer testified that the collector threatened to attach his wages and those of his wife.

Ms. Cole testified to overhearing threats of garnishment, and Train testified that such threats were commonplace. He, in fact, knew a collector who "knew the exact legal percentage that you would get under garnishment."

### J. Section 807(5)—threat to take unintended action

Greer testified that a collector threatened to take him to court, since "everything was at her disposal to collect this because this was a federal loan." Ms. Lebron testified to threats of suit. Ms. Norris, the collector for Greer, admitted in her testimony that "I may have threatened to sue him."

### K. Section 807(7)—representations of crime

Ms. Cavazos testified that she was threatened with arrest by a collector. Ms. Gress testified that she was told by a collector that she was "committing an act against the law because [she] wasn't paying" her debt. Greer also testified that he was told he was "breaking all kind of federal laws."

### L. Section 807(10)—false and deceptive means

Ms. Gress testified that a collector called her 12-year-old daughter and represented himself as a former co-worker from Sears to obtain her current work number. Greer testified that he was threatened with credit ruination by a collector; collector Norris, in fact, admitted to making this statement and justified it at trial by stating that "we do have the capability." Former collector Train testified that collectors used this "capability" to threaten debtors. Ms. Lebron and Ms. Walls both testified to the efforts of a collector to convince them he was an attorney.

Train also testified that the use of attorney letters against a debtor was structured largely for "scaring him into thinking that there would be litigation brought against him if he didn't pay his debt." The letters, "98 percent of the time," were used "merely as a technique to get compliance and payment." This was done even though Central Adjustment wouldn't litigate on debts "unless it was something just terrifically fantastic," in Train's words; this is corroborated by Ms. Knox, who testified that her client would not approve suit.

Collectors would call after the mailing of letters to say "now you can see that we're really telling you the truth" about threatening suit. This testimony of Train undermines the testimony of Lusk, who stated that Central Adjustment's attorney is "kind of funny" because he doesn't like to send letters out en masse; Lusk also testified that collectors cease to work accounts after the mailing of letters.

### M. Section 808(3)—use of checks to threaten prosecution

Train testified that collectors would often solicit post-dated checks to threaten prosecution on bad-check charges if they did not clear when deposited.

### N. Section 809—validation of debts

Ms. Cavazos testified that her collector refused to verify her debt.

### VI. Cleveland

Although the Cleveland office was by far the least of Central Adjustment's offensive efforts, the testimony of former employee Robert Kubovcik does establish a violation of the Act. The defendant's rebuttal witness, John Kastner, did not diminish the damage of Kubovcik's testimony and that of exhibit A–177. The violation established by the exhibit is:

### A. Section 807(5)—threat to take unintended action

The exhibit, a "talk-off" that Kubovcik testified he was directed to use in collection, states that the client "has asked that we file a district civil lawsuit, if necessary to recover" the debt. It goes on to state that "this is a standard lawsuit for non-payment of debt." I specifically find that this blanket statement is an impermissible threat of suit. Although Kastner testified that it was taken out of use, the manager who directed its use was fired for lack of profitability rather than for impermissible collection techniques. Kubovcik testified that he refused to use this talk-off, but that other collectors did not.

## APPENDIX B

### EXCERPT FROM THE TRANSCRIPT OF THE TRIAL BEFORE THE HONORABLE JERRY BUCHMEYER

August 9, 1984

Dallas, Texas

10:30 a.m.

### PROCEEDINGS

THE COURT: These remarks will be my findings of facts and conclusions of law on the portion of the case that has been tried. I will find, as you will see through these findings and conclusions, that there have been some violations of the Fair Debt Collection Practices Act, both as regards to form letters and telephone calls, but not nearly as many violations as the Plaintiff alleges.

And I want to talk to you after I am through with these remarks about what will happen with the remainder of the case.

The findings of fact and conclusions of law will contain the stipulation of the fact that in the pre-trial order was on Pages 2 through 9. The suit really involves issues concerning telephone violations and form letter violations. The basic issue on the form letters is the alleged threat to sue.

There was a claim concerning false or fictitious time deadlines, but I would specifically find there has been no violation by any of the deadlines that are stated in the form letters. There is also in the pre-trial order a general claim of misrepresentation, and I find that there are none except as I state in these findings.

There is an allegation of telephone calls to third parties, and I find there is no violation to that charge, with the exception of those that I will state. There is also a claim of a failure to file notices as required by Section 808(2) and 809 of the Act, and I have no evidence of any such violation.

So my remarks will concern the form letter violations and the telephone violations. Form letter violations: The first issue is whether or not the form letters were threats to sue. Taking the letters one by one, CABCO 1, which is Govern-

ment's Exhibit Number 13, there was no threat to sue. The statement is made that suit can be filed. That's a fact that a reasonable consumer or debtor would know anyway. They would also know that the amount of the CABCO debts, which were small debts—testimony ranges from a hundred dollars to fifty dollars to twenty-five dollars—would be such that suit would probably be unlikely. There is no necessity for a revision of this form.

As to CABCO 2, Government's Exhibit 14, there is an implied threat to sue in this letter. When the letter is read in context, it says you failed to comply with our last notice, and that requires us to send necessary papers to our local representative who will pursue your case to the fullest extent permitted by law. Second paragraph refers to if you pay the balance due, then we will of course drop all action. In context those two statements, the sending papers to our local representative, the fullest extent permitted by law and drop all action, would lead a reasonable consumer to believe that legal action was being threatened. That is a violation that could be simply corrected either by simple disclaimer in the letter—as in the Phoenix case—or by a revision of the form.

The J 1 letter, Exhibit 15, is not a threat to sue. Basically it is conceded by the Plaintiff that it is simply a notice that the debt is due and will initiate collection process. There is nothing improper about referring to a collection process, and that does not imply an intent to sue. I agree with the Defendants that the evidence did not establish by a preponderance of the evidence that there was a failure to send these letters within five days as the Plaintiff contends.

The jacket, debtor jacket, which did not contain a notation that this letter had been sent within five days, were not necessarily correct because of the evidence concerning the computer-generated J 1 letters at the same time the jacket was created.

The J 2 letter, Government's Exhibit 16, is not a threat to sue, and it's not a threat of any other action besides completing the form and either recommending or not rec-

ommending that suit is warranted. It states specifically that we may recommend that suit is or is not warranted, and that statement is not a violation of the Act.

The listing of the items that would be completed on a suit information sheet are reasonable items, and indeed CAB or any collector would be remiss if they did not gather that information for their clients in order to make an intelligent recommendation in order to recommend suit. I don't think that form either directly or indirectly implies that improper contacts will be made through third parties or that information disseminated because the information is being collected for the purposes of the suit information sheet and either recommending or not recommending suit.

The J 3 letter, Exhibit 17, is not a threat to sue, and Plaintiff concedes that.

The J 4 letter, Government's Exhibit 18, is a threat to sue. It is titled "preparatory listing for referral to attorney." It does not contain a reference to a legal suit or a lawsuit, but it does say unless you contact us within seventy-two hours, it will be presumed that we will have to take drastic action to settle this claim. Read in context, the drastic action on the referral to attorney would certainly lead a reasonable consumer to believe that suit was being threatened.

I do credit the stipulation which indicates that this form is still in use. If it's not, well, that simply means that CAB does not need to make any adjustment. If it's being used in other areas, it should be stopped. The form can easily be revised to be a legitimate form, and indeed Government's Exhibit 17, although that's on a periodic payment schedule, could certainly be used to come up with a form that could serve the same purpose. Or Government's Exhibit 19, which was indicated to be a fairly new form, is one that could be used in place of the J 4 letter. Government's Exhibit 19 is not a threat to sue. It's not a violation of the Act.

Government's Exhibit 20, which is the BP 1, the broken promise one letter, does contain a threat to sue. The context of that letter is that there have been broken

promises, a failure to pay, a failure to honor a payment plan. The context taken with the evidence I have heard is that there have been telephone discussions, and in all probability the debtor has been told that suit would be recommended or that suit would be possible, and those statements would be proper statements, but when the next letter is received saying we will commence collection action immediately, a reasonable consumer would feel that that would be a threat to sue, and that it would certainly mean something more than an additional collection letter.

The problem with BP 1 is not so much the language of the face of the exhibit—although that could be corrected by revision, and it could be corrected by including a simple disclaimer in accordance with the Phoenix case—but it is a problem also in the context in which the letter is used.

Government's Exhibit 21, which is PA 1, is not a threat to sue. That's obvious, and it is conceded.

Government's Exhibit 22—that's the C 18 form—That's not a threat to sue. It's obvious and conceded.

Government's Exhibit 23, the Government concedes that there is no evidence that this was used in an improper manner. And in effect they concede that it is not a threat to sue in the context of the evidence that I have heard.

I would be remiss if I didn't state that I think there are problems with that form, and not necessarily from the language on the face of it, but in the manner in which it may or may not be used. It refers specifically to the action previously mentioned will be instituted. That may refer to telephone calls. It may refer to a prior form letter.

If it is used after a J 4 letter—which I do construe to be a threat to sue—then this would refer back to the J 4 letter and would cause problems because the consumer receiving that would consider it a threat to sue.

On the other hand, if it was used after a J 1 letter or after one of the other letters that I found would not constitute a threat

to sue, I think it would not be. I think rather than take a risk of what would happen, it would be better to revise that form, although I again note that the Government has conceded that there was no evidence of improper use of that form.

Government's Exhibit 174 would be the end letter and is not a threat to sue.

Next are the attorney letters by Mr. Bamford. These are Exhibits 25, 26 and 27. It is obvious to me that any reasonable consumer who would receive those letters from Mr. Bamford, an attorney, would consider that a threat to sue was being made. The fact that they are from an attorney, that the first letter refers to further action, the second letter, Exhibit 26, refers to the filing of suit, drastic action and refers to vigorous—and then the third letter refers to vigorous prosecution of the collection of the account, as well as the expense and inconvenience of a lawsuit would indicate to a reasonable consumer that a threat of a lawsuit was being made.

However, I would specifically find from the evidence that I have heard that Mr. Bamford does have authority from the client, from the companies to whom the debt is owed, to send these letters; that the evidence does establish both his testimony and Exhibit D 2, that on behalf of Mr. Bamford CAB obtains authorization from the client for Mr. Bamford to represent the client in collection efforts.

It doesn't mean that Mr. Bamford at that point is entitled to file a lawsuit, but that he certainly is entitled to write demand letters. Not every collection matter that an attorney gets is going to be one in which a lawsuit is filed. That's obvious. The fact that CAB and not Mr. Bamford makes the client contact at this point does not mean that there is not an attorney/client relationship established.

In addition to Exhibit D 2 and some of the debtor files that were gone over in testimony, there are also letters that are similar to D 2 that indicate that there has been a signed document by the client authorizing Mr. Bamford to act as the client's attorney; not to file suit, but to act as an attorney.

The letters then, 25, 26 and 27, even though they are prepared by CAB and even though they are reviewed and signed in CAB's office by Mr. Bamford, are attorney letters. I am not going to find that Mr. Bamford has committed any unethical conduct. I don't think he has.

He has not loaned his letterhead and his name to CAB simply to send letters at random. He has gone into the office on a regular basis, several times a week, varying amounts of time. He does at least spot check the files. I find nothing wrong or evil with the fact that the collector indicates what letters should be sent, or what letters should be prepared for Mr. Bamford's signature.

Indeed, I think the economics of the collection business would be such that either the collection agency could not afford to its clients an attorney, who obviously operates at a very low cost to send the collection letters, or turn the file back over to them to either cause them additional expense to obtain an attorney to handle these, which would be very difficult to do.

I do not think the Commission is correct if it takes the position that this relationship is a violation of the Act. On the basis of the evidence which was presented to me, it is not. Therefore, the letters, Exhibits 25, 26 and 27, are attorney letters. They are sent by Mr. Bamford as an attorney, not as a collector, and they are exempt from the Act.

The violations which I have found on the form letter violations: CABCO 2, Exhibit 14; letter J 4, Exhibit 18; BP 1, which is Exhibit 20; and on Exhibit 23, I have indicated that that may or may not be a threat to sue based upon the context in which it's used.

The second question is whether there was an intent to sue at the time these letters were mailed, and by "these letters" I am not limiting my comments to CABCO 2, J 4, BP 1, Exhibit 23 and to the attorney letter.

The sequence which seems very obvious from the evidence I have heard is this: CAB enters into written or oral contracts with its clients. There is some dispute as to the percentage of written contracts and oral contracts that is totally immaterial to this Court's decision. CAB asks the client if it is willing to bring suit if it's warranted, a decision which obviously can be made only on a case-by-case basis. Someone has to compare the amount of the debt to the likelihood of collection to the assets that the debtor may have. It simply cannot be done in a vacuum at the time the original contract is entered.

Nevertheless, CAB asks the client whether or not it's willing to file suit, and the note says on the client information sheet, Exhibit 42, to where the client will sue or will not sue.

As to the authority to file suit, under the written contracts that were presented to me in evidence, they expressly require written authorization of suit by the client. There is some testimony that some oral contracts would also require written authorization, some testimony that the client, some clients permit CAB to make the decision; Mr. Maddin so testified.

However, Mr. Bamford, the attorney involved in these indicated that the client authority was necessary or he wouldn't file suit. That small factual conflict I don't find to be material because the use of the forms in question, those I have indicated under the evidence, is not limited to those in which the client has authorized CAB to make a decision.

Indeed, the testimony of the collectors I have heard is to the effect that they are careful to advise the debtor only that they will recommend that suit be filed, not that CAB will file suit. And I find no exhibits, debtor jackets or otherwise, which contain some indication on the debtor jacket that the client has authorized us to file whatever suits we deem necessary, as there is an indication on the debtor jacket as to whether the client will sue or will not sue.

As to the authority of Mr. Bamford, the attorney, at the time the contract is entered with the client, CAB obtains authorization from the client for Mr. Bamford to represent the clients in collection efforts. Defendants Exhibit 2, the testimony of Mr.

Bamford, establishes this. This authorizes the sending of the collection letters by Mr. Bamford. It does not authorize filing of suit by Mr. Bamford, again because some of the contracts both written and oral require express written authorization because Mr. Bamford indicates that he must have a sworn affidavit to file the sworn account suit.

In connection with the attorney authorization, the evidence also establishes that the client is given an opportunity to choose a different attorney if they wish, and they need not use Mr. Bamford. There was some testimony which I credit from Mr. Rayburn Anderson to the effect that he on occasion represents some of the CAB clients in collection matters, and he represents them as his clients, and that does support Mr. Bamford's testimony.

Next in the sequence the collector makes telephone contacts. He sends form letters as he deems appropriate. It varies with each individual case, which is to be expected. At the time the forms in question are sent, and this would be CABCO 2, J 4, BP 1 and Exhibit 23. The collector himself does not have any intention to file suit, nor does CAB.

At this point they wouldn't have authority from the client, at least in most instances, and indeed they are careful to advise the debtor that they may recommend that the suit be filed under the evidence that I have heard.

At the time the attorney letters are sent, as indicated, Mr. Bamford does have authority to represent the client. He does have authority to send the attorney letters. These are 25, 26 and 27. But he does not have authority to file suit from the client except in a small number of cases as he explained that he receives the file for some unusual reason in which suit is already authorized.

In most instances the attorney letters are sent, and if unsuccessful, then a determination is made to either recommend suit or to not recommend suit, and that recommendation is made to the client.

As I have indicated, Mr. Bamford is acting as attorney for the client when he sends these letters, so they are letters exempt under the Act, and even though those letters do contain implied threats to sue, as would be supported by the Phoenix decision in terms of the meaning of those letters, they are exempt from the Act.

As to authorization to file suit, there is no evidence whatsoever that suit is filed without authorization of the client. CAB, if the attorney letters are unsuccessful, then gets authorization from Mr. Bamford in appropriate cases. This includes written authorization on affidavits to file the sworn account suit, the furnishing of supporting documents, such as suits on notes and on some—I could not say all, from the evidence before me—The form which is shown as Government's Exhibit 36 and 37 has some examples which are titled requests for authorization to file suit.

Therefore, in summary of the first point, the Plaintiff has established that the letters I have indicated: the CABCO 2, the J 4, the BP 1 and the attorney letters are sent without intent to file suit.

The CAB letters do violate Section 87 5, that being a threat to take any action that cannot legally be taken or without any intent to take such action.

However, the attorney letters are exempt and, in addition, I have indicated concern about problems that may be caused in the future by the form which is Exhibit 23.

The evidence which does support this conclusion may be summarized, the primary evidence, as follows: number one, as to the CABCO letter, the CABCO accounts are so small that very few suits are ever filed, and the Defendant is very candid about that. So, in a vast majority of cases in which CABCO 2 is used, there is no intent to sue.

Next, when the CAB, and the other CAB, the J 4, and the BP 1 and the attorney letters are sent, there has been no authorization from the client to file suit in a specific case. The collector, as I have indicated, has no present intention to file suit, nor does CAB. The client hasn't even been asked to authorize suit in that specific case at that time.

And finally, certain circumstantial evidence would support that conclusion that there were many instances in which letters were sent without suit being filed, even though the debts were not paid; that there were instances where letters were sent and the client had indicated it was not willing to file suit; and there were instances where the clients instructions were that written authorizations were required before suit is filed.

The Defendants' evidence does establish that it has a policy against threatening suits and that it does instruct its employees not to threaten to file suit.

The evidence is also established that there is certain training of the employees and collectors, and that there has been an effort, which is obvious from the exhibits by the Defendant, to comply with the Fair Debt Practices Act. But the problem with these particular letters are that the form letters themselves which I have indicated, the three, do contain implied threats to sue, and that despite the company policy, the fact that the form letters exist would show that there has been a violation of the Act.

As to the second phase of the lawsuit, the telephone calls, this simply involves a balancing by this Court of the credibility of the witnesses involved, and I will simply recite the credibility findings that I make. All of these are based upon the demeanor of the witness in court, whether the witness has a particular interest in the outcome of this lawsuit, whether the witness' testimony was inconsistent, whether it was supported by other evidence, whether the witness' testimony contained matters that were incredible and this Court shouldn't believe.

Jesse Graham, Exhibit 188—and on each witness I will give the exhibit file for appeal purposes to make it easier for the Fifth Circuit. Exhibit 188, Plaintiff claims here that there were repeated phone calls to Jesse Graham, and there were threats to file suit. Jesse Graham was not a credible witness. He gave false testimony during his deposition concerning his other criminal convictions. In court he without any basis of course took the Fifth Amendment, which I permitted him to do simply to avoid a problem.

He did testify very—to one very unbelievable point, and that was testimony that he didn't know that he could be sued, and he was surprised when the letter told him he could be sued. It was obvious that he was not giving truthful testimony. He also testified at one point that what the collector said was that I could be sued, not that I would be sued.

There was a dispute over the bill for Parkland Hospital. The debt involved about two hundred dollars. Although the bill was subsequently paid, the evidence does establish that at the time the collection efforts were going on CAB was advised by Parkland Hospital that Mr. Graham was wrong and that he was delinquent.

The Defendants' witness on Mr. Graham was Mr. Mike Musney, and I will credit the testimony I heard from him concerning this matter. The collection file, the debtor file, Exhibit 188, is consistent with his testimony. And I would find that there was no threat of suit; there was no use of profanity; there were no repetitive or harassing phone calls.

Exhibit 182 concerns the next debtor Santos Fadilla. The claim there is that a lawsuit was threatened. The debt was a hospital debt due Southwest Community Hospital, one hundred dollars. The debt was not paid. As I understand the evidence, the debt still hasn't been paid.

Mr. Fadilla was not a credible witness, wasn't credible about anything. His demeanor was such that it was obvious that he had an axe to grind. Without elaborating, he gave testimony, which if not false, was inconsistent during his deposition and the testimony he gave at trial.

By referring to an axe to grind, I mean that he received one phone call and that that generated—that one phone call generated a complaint with the Better Business Bureau and the Federal Trade Commission, the city and maybe others.

As to the company witnesses, both Steve Davis and Jackie Fischer testified. As to

Steve Davis, I do not credit his testimony. The notes which he made on the debtor jacket contained no real description of what took place during the conversation.

Despite the fact that I do not believe Mr. Fadilla, though, I do believe that there was some explosive telephone call that took place, and after that has happened to have a notation which simply said "sue" is not believable. I strongly suspect that if profanity was used during that instance, it was used by both Mr. Fadilla and Mr. Davis, but I need not resolve that.

Jackie Fischer was credible. She certainly made no threats, and she supports the fact that CAB was advised by the client that Fadilla did not understand the bill and that his account was delinquent. Here again, there is a failure of the Plaintiff to sustain the burden of proof.

Next is Mr. and Mrs. McDaniel, Exhibit 183, claim of harassing phone calls, threats of lawsuit and calls at work. The wife was for the most part a credible witness, and I do again credit her testimony that she was called at work after the collector was told to stop. This involved the Plano General Hospital bill for fifty-three dollars, and it was not paid. Under the evidence I have heard has still not been paid.

I do not find the husband, Mr. McDaniel, to be a credible witness. He was knowledgeable about the Fair Debt Collection Practices Act, having been a debt collector at one time. I am concerned that he is attempting to get some personal gain, that being a debt that has never been paid because of a repetitive excuse that there was a dispute between insurance companies.

Therefore, I don't credit his testimony that there were harassing calls, that suit was threatened, that there is no identification of the person. Indeed, I was concerned that he gave me a litany of almost every violation under the Act. I do not credit any of that.

For that reason I also do not credit Mrs. McDaniel's testimony to the extent that she said the calls were harassing or that there were numerous phone calls or that a suit was threatened. She testified that there were over twenty-four calls, and I do find

that difficult to believe because that would have been twenty-four calls, over twenty-four calls, to collect a debt that was only fifty-five dollars.

Mike Musney, who used the alias Mike Moore, was a collector, and I do credit his testimony that there were no repetitive phone calls, and there was no threats and no harassment. I do not find credible one part of his testimony, and that's that he wrote down everything that was said. The jacket would indicate that was not done, and therefore, I find that Mrs. McDaniel was correct when she said the calls were made to her at work after she asked them not to.

Sandra Dorough, D-o-r-o-u-g-h, Exhibit 95, the claim is threats to file a lawsuit. This involved a hospital bill at Medical City, some three hundred and sixty-seven dollars. The bill was immediately paid after receipt of the first CAB letter.

Finally, Miss Dorough was a very credible witness. She had no personal gain in terms of her testimony. Her debt had been paid. She was told she would be sued and that her credit would be ruined. The collector was rude, and CAB did fail to check her advise that the hospital had been paid.

I do find that her husband was credible, also. During his telephone calls there was no threat to sue made, and he was very candid saying that he was told he could be sued. That would not be a violation. I note that simply to indicate that the credible testimony given by the husband, I think, certainly supports the testimony given by the wife and her credibility.

As to the company witness, Mr. Hart, he was credible and he did not have any present interest in this lawsuit, but he had no recollection of what had happened. He just recited the notations on the jacket, and that is not sufficient to rebut the credible testimony of Mrs. Dorough. Therefore, there were threats made to file suit.

Barbara Sampson, Exhibits 116 and 187, involving an American Express debt of some thirty-three hundred dollars, a debt which, although not paid, was discharged in a bankruptcy proceeding. Claim is that

there were harassing and abusive telephone calls, threats to sue, calls at work. The collector involved was the alias of Ralph Miller, who also was identified as the person who called one of the other debtors, Miss Solis.

Miss Sampson was a very credible witness. She had nothing to gain. Debts has been discharged. From her demeanor, the fact that there was no exaggeration in her testimony—She testified that there were eight to twelve calls. Her testimony was believable. Threats were made to her that the VA would be called, and the matter would be sent to the Grand Jury. Calls were made that were abusive. She was told that she was a criminal; that she shouldn't be allowed on the street. Threats were made that we will file suit. There were repeated calls at her business.

There was some inconsistency in her deposition testimony concerning the amount of the debts discharged, and I have considered that, but she made a very reasonable explanation and a very believable explanation of why her answers differed at that time.

Collector company witness was Clarence Dillard who used the alias of Ralph Miller. Mr. Dillard wasn't a credible witness. The same pattern in this case exists in the case involving Miss Solis. Mr. Dillard made a notation of "pure trash" on the debtor jacket. His explanation of that notation is not believable. It's obvious that he was referring to Miss Sampson, not as he attempted to explain to the substance of the telephone call. That notation, if not given the correct interpretation by me, would certainly a stupid thing for Mr. Dillard to write on the file, because there was no way for any subsequent collector who may have worked that file to know what was meant by "pure trash."

He also gave inconsistent testimony. He first testified that no complaint was filed by Miss Sampson, but there was a memo dated March 28, 1982, concerning Miss Sampson's complaint in which he made an explanation of what was done. He made a very lame attempt to explain that memo as being written for the purpose of suggesting that the client go to the District Attorney with the check that had been returned. That is totally incredible because going to the D.A. is not even mentioned in that March 28 memo.

Mr. Dillard also sent collection letters to Miss Sampson's place of employment, which was unnecessary, and then finally Mr. Dillard also was candid in admitting that he had no recollection of the case and was simply reading the notations on the docket sheet.

I find that there were harassing and abusive telephone calls made to Miss Sampson; that there were threats made to sue her; and that there were calls made to her at work after she had asked that they not be made.

Next Becky Stroud, Exhibit 181, claim of deceptive phone calls and calls before 7 a.m., refusal to verify a debt and threats to file suit. This involved the hospital bill Herst General Hospital for some three hundred eighty-four hundred dollars.

Miss Stroud was a very credible witness. Her debt was paid immediately after the first CAB contact in which she appeared in court. She had nothing to again personally from her testimony.

She did advise CAB after she got the urgent call from CAB that the hospital had been paid. There was no verification. Instead the collector threatened suit. I credit Miss Stroud's testimony that she was called before or around 6 a.m. in the morning, that she was sent letters including the attorney letters and received calls after the debt had been paid.

She was credible, also, because she testified that there were no collection contacts made after Mr. Bamford's letter had been sent. And I note that both in making a credibility determination and in indicating that that also bears on the findings that I made concerning Mr. Bamford's relationship with this matter.

The CAB witness was Mr. Steve Eddington, but he was not the collector in this case. He testified that someone else was the collector, so he does not really contradict Miss Stroud's testimony.

He did candidly confirm that there was a problem about the hospital not verifying payments which had been made. The collector—I am not sure of the evidence was not given to me. The file contains the name of a Mr. Crosby and Mr. Van Smith. That's in a letter by Miss Stroud, and I don't know whether those are aliases or real names because neither was identified. I do find that the violations were established in this case.

Next, Sharon Stallings and Miss Stella Gambo, Exhibit Number 192, claim of harassing and abusive phone calls and threats to file suit. This involved the John Peter Smith hospital bill for some seventy-five dollars and ninety-five cents. I don't have clear evidence as to whether the debt was paid or not. I doubt it was; I am assuming it wasn't.

The daughter was extremely credible. She did not use profanity in the telephone call. This is confirmed by her mother who was also a very credible witness. Her daughter had no real personal interest. No complaint had been filed. She really was not trying to get out of the debt that's involved, a county hospital, a charity hospital, and Miss Stallings was understandably upset at receiving a collection letter since she had done volunteer work at the hospital for quite some time, and then later became an employee of the hospital.

I credit her testimony that the collector said unless your mother sends us the money we will sue her, that the collector was rude and harassing and that the collector called Miss Stallings a bitch.

I also credit her testimony that she was told by someone else—and the evidence is unclear—It appears to be an alias Mike Moore. It may have been Mike Musney, but I don't know from the evidence. But I do credit her testimony that she was told when she complained about the collector that, if you do not forget this, you will be in more hot water than you can handle, and she asked if that were a threat, and she was told, you can take it any way you like.

Mr. Musney did testify—He was not cross-examined on this point. I do find this Mr. Musney was credible in testifying that he did not threaten suit, and he did not use profanity, and he was not asked about the threat of a lawsuit either on direct or cross.

The collector was Evilyn Loubriel, L-o-u-b-r-i-e-l, and she was not a credible witness. The demeanor and the manner of testifying, the fact that the evidence does establish as argued by the Plaintiff that there was an alteration of the file jacket and that she crossed out the entry of an attorney letter in a different color ink from the rest of the jacket.

She was not telling the truth when she said she didn't use profane language, and she was lying when she said she did not threaten suit.

Rosalinda Solis, Exhibit 189, claim of threats to file suit and use profanity. This involved a student debt, Pan American University, which was some forty-two hundred dollars. Miss Solis was a very credible witness.

Again, the person who called her used the alias of Ralph Miller, and that was Mr. Dillard. I do credit Miss Solis' testimony that Mr. Dillard, Mr. Clarence Dillard, who is Ralph Miller, told her she better get her ass straightened out, that he called her several times with deceptive and harassing phone calls, that he told her she was going to be sued, and that her credit was going to be ruined.

As to Clarence Dillard, I have already indicated I do not find that his testimony was credible at all. I also note that Miss Solis and Miss Sampson do confirm each other's credibility because of the similar story that they tell about the same collector.

Jackie Fischer was a credible witness, and I do find that she did not threaten to file suit and she did not make calls at any improper times, but she does indicate in her testimony that there were several contacts made with Miss Solis by other collectors before her.

There is general testimony of the company's efforts as to training and company policy. I do credit that testimony, but that does not rebut the findings that I have made, and that there have been violations

concerning the telephone calls. In addition, I note that I have no proof before me concerning the company policy that any collector has ever been discharged or even reprimanded for disregarding the company policy.

I have no evidence of the enforcement of the company policy. I would have been impressed with evidence to the effect that the company had taken steps against people that had violated company policy. I think there is some truth and arguments by both sides that we can't know everything that's going on. That's CAB's position and the Government's claim that they must at least have known of some things that were going on.

I do have testimony about the ability to monitor the phone calls, testimony about the location of the collectors in the office and the ability of people to overhear what's being said.

Brenda Yoder, an ex-employee, in analyzing her testimony she testified primarily to abuses by Steve Eddington and by John Taylor. Neither of these were collectors mentioned by any of the debtors' witnesses who testified. Eddington did testify concerning Miss Stroud, but as I have indicated, someone else was the collector. He was not on that case.

I do credit Mr. Smith's testimony concerning the circumstances under which Mrs. Yoder left, and I discredit her testimony at least partially for that reason. She did refuse to take the polygraph test. It seems obvious from her demeanor and from the circumstances that she did have a grudge against CAB.

She particularly had personal problems with Mr. Eddington. She thought he had circulated a rumor that she had stolen the money in question, and also to a lesser degree had personal problems with John Taylor who she testified made comments of a racist nature to a collector in the office who was black. I have no support for her claims against Eddington and Taylor, and therefore, I do not credit those; and by support I mean other evidence or other exhibits.

There was some of her testimony concerned alleged violations that again I will not credit because I don't have other evidence, and I am concerned with her credibility, that being the statement that collectors said they were associated with Mr. Bamford, an attorney; that I'll send kids out to have them tear up your house; that on occasion children answered the phone and collectors talked to them; and that collectors said if you don't pay, God is going to get you. I do have her testimony, which supports some of the other telephone violations which I have found, and I would credit that, although noting I still have some problems with her credibility.

Summary of the telephone violations concerning the Dallas office, some collectors at the Dallas office: one, made threats that suit would be filed, Dorough, Sampson, Stroud, Stallings, Gambola and Solis; two, made threats that credit would be ruined, Dorough, Solis; three, made calls to places of employment after being asked to stop, McDaniels, Sampson; four, made calls that were harassing because of the number of repetitive calls, Sampson and Solis; five, made abusive telephone calls, Sampson: threats to call the District Attorney, shouldn't be allowed on street, you are a criminal, Stallings: you are a bitch, and Solis: get your ass straightened out; six, made calls that were harassing because of the time, Sampson, and to a lesser degree Miss Stroud's testimony; seven, failure to check the validity of the debt, sending a letter or making telephone calls after a debt has been paid or notice of dispute given or arrangements made directly with the creditor, Dorough, Stroud, Solis; and eight, other violations, threat to a person complaining and that's the Stallings, Gambola matter.

I note that of those violations that I have found that number one involves Clarence Dillard and Evilyn Loubriel, one unknown collector and Mr. Hart. As to number two, Miss Loubriel is involved again, and the other collector is Mr. Hart. As to number three, Mr. Dillard is involved again and Mr. Musney. As to number four, that being the harassing phone calls, Mr. Dillard is involved in both. As to five, abusive phone

calls, again we have Mr. Dillard and Miss Loubriel. Mr. Dillard scored twice in that one. And number six, we have again Mr. Dillard and the unknown collector involved with Stroud. Number seven, we have Mr. Dillard again and an unknown collector with Stroud and Mr. Hart.

I simply make those comments to indicate the number of times that Mr. Dillard and Miss Loubriel appear on the telephone violations.

As to the relief which I think proper in this case, the Government has sustained some of the form letter violations, and they have met their burden of proof on some of the telephone calls and not on others. The appropriate relief is simply injunctive relief, that the form letter violation—It should be an injunction their use until they are revised of the CABCO 2, the J 4, the BP 1, and again, I am not making a ruling because I have a concession that there was no problem, but I express some concern with Exhibit 23.

No injunctive relief is proper as to the attorney letters.

As to the telephone violations, it would simply be an injunction against the offenses which I took pains to list in the summary. Those are the violations which I have found.

This is not a case in which civil penalties are proper. Both parties have prevailed on some issues and not on others. I have indicated in my findings that there is no bad faith on the part of the Defendant, that they have taken efforts to comply with the Act.

I don't have, based upon this record, evidence that injury to the public with these three form letters and the cause in the Dallas office would be of such grievous magnitude that it would require civil penalties.

As to the deterrent effect, I can accomplish that by injunctive relief, and obviously if there are further violations, then that can be dealt with by this Court on a motion for sanctions under my contempt hours, and I think that would accomplish the deterrent effect.

There should be no attorneys' fees awarded to the Defendant. There is no showing that the case wasn't substantially justified, and that follows from the findings which I have made and which the parties have won part of the case and lost part of the case. I also note that under the evidence I have heard it's obvious that the case did have substantial justification. It was a situation where the parties were not able to resolve the issues, although, as I will indicate later, I would strongly think you should resolve what's left.

You needed a decision on the letters, and I have given you one. There were fact questions concerning the attorney letters, and I don't mean my comments or questions during argument to mean otherwise. That is a serious question and one which I had in my mind from the time we began testimony—I wanted to hear Mr. Bamford's testimony and the other evidence, and that was a serious problem. The fact that I have resolved that against the Plaintiff does not mean that I did not think that his lawsuit was without substantial justification.

As to the claim against Mr. Maddin, individually, there is no basis for any individual liability against Mr. Maddin. There is no indication and no proof that he has been involved in any wrongdoing, and I have indicated as to the telephone calls, the collectors that were involved, I have no proof that Mr. Maddin knew what was going on.

My only concern, again, on that is that I would have been impressed if I had had evidence of actions taken against some of the collectors, and maybe that was done, but I didn't have that evidence, but I would have impressed by that fact. I think probably the Government would have been impressed by that fact also to see actions taken against collectors.

I simply opine from the evidence I have heard that I think it's obvious that there is a big turnover with collectors. One of the witnesses so stated. I would think that it would be difficult not to get a bad apple. I think I have had two here. I think Mr. Dillard was a bad apple and I think Miss Loubriel was a bad apple, and I think those

are the type of people that probably should have been discharged, and certainly some action taken against them.

I will note in that regard that I disagree to some degree with what the Phoenix judge did in granting the summary judgment on the collectors that were discharged. I think that's—I haven't thought this through, and it doesn't involve this case, but I think that's a mistake. I think to punish a debt collector agency for firing collectors who have made—who have obviously violated the Act is self defeating. I think the company should be penalized, and the remarks the judge made in that opinion on granting the summary judgment bother me a little bit, and I am suspecting that he is going to take care of that when he gets to the penalty stage in that there would be no penalties entered, but nevertheless, I want you to know how I feel on that.

As to the Defendants' counterclaim, it is dismissed. There is no basis for the counterclaim. The Act does prohibit trade regulation rules, but the letters that are contained in those exhibits are not trade regulation rules, and I would not enter an injunction.

I think the letters, although they are not binding on the Commission, do give an opportunity to work out something in advance of a lawsuit by agreement. Apparently that was not possible in this case because of the dispute on the letter violations and opposite positions that the parties had on the letter violations.

Those are my findings and conclusions, and although I could have taken six months and done a much better job and given you a polished version, I wanted to end this phase of the lawsuit, and they will be sufficient to tell the Fifth Circuit the decisions I have made and why I have made them. So if there is an appeal by either side, this will be part of the record, and they can see that.

I don't want either side to go to unnecessary expense for presenting me with findings and conclusions. It's not necessary. I don't want the Government to spend any more money, and I don't want the Defendants to spend any more money, and, you

know, if you are just overcome when you get back to your office and you want to present something, I will look at them; but I hope I have resolved those.

I want to talk to you now about the rest of the lawsuit, and I want your suggestion is as to how we can end the lawsuit, and how if you want to appeal you can go ahead and do so based on this record. I don't have a good suggestion on the telephone violations. The reason I asked the questions I did about would the suit have been brought on telephone violations is I didn't think that was a major part of the lawsuit.

As to the letter violations, my feeling is that although this was a case involving the Dallas headquarters and the Dallas office, that the same basic letters are used by CAB around the country. If you want to spend some more time and money, you can do it. I am not going to give you a lot of time, but you can do it, and I can theoretically sit here and listen to evidence from people from twenty-three different offices, but unless the letters vary, we will come out at the same point.

I strongly suspect that on the letter violations if you can't reach an agreement on getting it out of the way, if you filed a one-page motion for summary judgment, a cross motion for summary judgment, I would do the very same thing on the letter violations that I have done today.

The only variation, I think, would be attorney letters, and there is some testimony by Mr. Maddin and others that there may be some other attorneys like Mr. Bamford revised a few of those letters, but I think those revisions would probably be minor. And I think the central issues involved in whether these letters are threats, whether there was an intent to sue when they were sent, is going to be exactly the same evidence that you would develop from any one of the offices.

So I am—As you can tell, I am suggesting an end to the case in some manner, and then permitting you to go ahead and appeal if either side wanted to appeal.

Mr. Philipps.

MR. PHILIPPS: Your Honor has given us a lot to digest. I think that with regard to the attorney letters, which are a central issue, that if there are differences in the other offices they will shortly be revised to conform with Your Honor's opinion here today.

So that my reaction right now is that, as far as that is concerned, that it does not appear to be worthwhile to proceed with regard to the attorney letters and the other areas.

What I would like to suggest to Your Honor is that there is a great deal to be digested, and in essence there are a lot of policy decisions involved in this decision. Your Honor's decision will have a significant effect upon the enforcement of this Act by the Federal Trade Commission and the Department of Justice. I would like to have the opportunity to get Your Honor's opinion—

THE COURT: I don't think that's correct, and I will tell you why. I think the only major issue that would have an effect beyond this particular case is not the wording of these letters—because that can be handled by revisions—but the attorney letter issue. And I don't think a lawsuit in which that practice is not attacked directly resolves that issue, and if I had different evidence I may reach a different conclusion, and if I had a different attack I would probably have a lawyer in here representing Mr. Bamford because there may be a potential conflict between CAB and Mr. Bamford.

So I personally don't think my comments on the attorney letters or my fact findings resolve that question at all. I think it's open, and I think given another set of facts there could be a tremendous abuse by an attorney, and I won't repeat the comments I made, but I saw some of those and—

MR. PHILIPPS: Right; I think we do have a basic difference right there, and I think that's why it would be—It requires us to do some time evaluating this, because I do feel that you do see it differently than the Government. And I think it—Assuming that you are right, I think it will take some—a major amount of evaluation and thought by F.T.C. and the—

THE COURT: Well, the decision that you have to make on that is whether to appeal or not. You have got the basis for the appeal.

MR. PHILIPPS: Right.

THE COURT: You don't need to go out and do discovery of twenty-three other offices or twenty-two other offices. That's a decision on what we have tried. So I think you have got to come back and tell me—It doesn't make sense for you to waste your time on these other offices. You need to spend Government's resources on an appeal if it's going to continue.

MR. PHILIPPS: Right; I think you are right, but what I am suggesting is that I am requesting you to give me some time to do that. I think that I would like to get, you know, the printed version of Your Honor's opinion as reported by the reporter, get it in Washington, give it to the people who are involved in policy making and give them time to digest that and to consider its effect upon our—the Government's general approach and the effect it will have upon, you know, other cases and policy.

I think the Government does have a basic different approach to the way you have evaluated the attorney letters.

THE COURT: I know that, but your decision is appeal or not appeal.

MR. PHILIPPS: Right.

THE COURT: And not to waste time.

MR. PHILIPPS: Yes, Your Honor, but I think that the people in Washington will, I would hope, say that there is no sense in seeking to go elsewhere. The possibility exists, Your Honor, that they might say, well, we should determine whether there are nuances that might change us around, and I don't think that would be worthwhile, myself personally.

THE COURT: I don't either, and that's what I will be upset about on that, and I am not going to let you get by with that. I can't let you go waste any more money and time and I realize, you know, nobody is bound by what you are telling me because

the Defendants, they may want to appeal, and, you know, whether there is an appeal by the Defendants may have some bearing on whether there is an appeal by the Commission. I understand that. Let me get—

MR. PHILIPPS: Could I make just one more point? I would rather—If we are going to appeal, I would rather not have the issue before the Court of Appeals for one of the issues that you foreclosed us from discovery elsewhere. I would hope that our resolution—

THE COURT: Well, I am not going to do that.

MR. PHILIPPS: Right; you will give us one week. I would hope that the resolution by the Government would be to say that we—If we disagree and we decide to appeal, that we come back, Your Honor, and say we are ready to structure this to allow an appeal.

THE COURT: Well, let me—

MR. PHILIPPS: The Government may decide not to even appeal, Your Honor. They may agree.

THE COURT: Well, let me get Mr. Wilson's thoughts about the other offices and the other states.

MR. WILSON: Our main concern is to bring the matter to a conclusion. The loss of clients has been the main damage that has been done to the company, really, by the dependency of the lawsuit. So we would hope that the Government would agree that the Court's order would put an end to it, and the parties can then decide whether they want to appeal or not.

I do have one request that I would like to make, point out the problem that the company faces. All of the various states, or most of them, have regulatory bodies that regulate the collection industry. And they have to approve the forms that are sent out. Some attorney generals have to approve the forms that are sent out. To change forms is not something that can be done overnight.

I asked Mr. Maddin what's a reasonable period of time to accomplish that on a nation-wide basis. He tells me he would like to have six months with a minimum of ninety day's delay before the injunction would become effective in order to accomplish these changes since he has to get approval from so many people.

THE COURT: What I would like to do is to get an injunction entered, but with a time stated for that to be done, and it's going to be a little time before I get the injunction entered, unless I do it myself which I might do, but it will be a little time before it's entered, and I understand the practical problem, but I would prefer to put ninety days for the change over, and then if you need to ask for an extension and explain that it hasn't been done in one state or another, that would cause no problem. But let's go ahead and get it done where it can be done.

MR. WILSON: All right, sir.

THE COURT: But the other consideration would be that if there is an appeal and cross appeal, unless you all can work out an agreement that there is not going to be an appeal, then my inclination would be that the injunction would be stated pending the outcome of the litigation.

You know, the judge in Phoenix just read letters and basically I read letters. I had the benefit of some testimony, but I think the Government is correct that the interpretation of the letters was really one of the law, meaning that the Fifth Circuit could read those letters and disagree with my interpretation of the letters, that my findings of fact are not that shielded from a Fifth Circuit review on the interpretation of the letters.

You know, you could win some on appeal. The Commission could win some on appeal. Or the fifth Circuit may affirm exactly what I have done. So there are several consequences, and I have some concern about starting the revision of the forms until we actually know where the appeal is going, but I hear you saying you have no desire to try the other outlining districts, and the telephone accounts in those other places. Of course you are a defendant; you wouldn't want to try them.

MR. WILSON: No, sir.

THE COURT: Okay. I think—I am talking to both of you now. I think this could be accomplished in—and I don't have any problem with time for the Commission to make a decision, but I would suggest that the reasonable thing to do and the way to cut an end to the expense of litigation by everybody is to enter an agreement that insofar as the letter violations are concerned that my order, or whatever happens to it on appeal, will control the letters uses by CAB all over the country.

I think that's a simple agreement, and you reserve all your rights, and if I am right, I am right; if I am wrong, I am wrong. And you can even build in a proviso so that if it's reversed and comes back down to me on remand, well, then the issues of the other offices can be discussed again if events develop that we need to go into that.

Secondly, I think the only way to get rid of the telephone violations is simply to forget them, recognizing that you have won on the telephone violations here, and that you really don't need injunctions against every office of CAB.

If we had to go forward with either aspect of the case, the letters or the telephone violations, you are on notice that if that's going to happen, then I want you to know that I am going to be very unreasonable, but I am doing it for a purpose. I am going to set you for trial just as soon as I can get you set for trial, and that will very probably be in January of next year, and I am not going to mess with discovery.

I am going to say do whatever you want to do. Get it done and come in in January, and we will get rid of it, and the purpose of that is so just because of time constraints. You have got to resign your discovery, and you can't go out and take a hundred and twenty depositions. You are going to be limited and selective in the depositions that you take.

You are going to have to one office or another, and I don't need twenty-three offices. If I get similar testimony on telephone violations from two or three other offices, then I think I would be justified in saying, you know, the practice will therefore probably exist in the others. If I don't, it would not, and it would be limited to Dallas.

As to the letters, I can't really conceive of trying anything on the letters, and if you all didn't file a motion for summary judgment, I would probably file my own and get rid of the letter violations on that basis. But again the only reason I do that is—If I don't get an agreement from you so I can at least put a dollar limit on—I know that there are just so many hours available in the next four or five months, and that that's going to be the limit to the attorney's fees that are going to be incurred in the case.

So, as you say, I am asking you questions that you need to talk to people in Washington, and you need to talk with your clients about what to do. I would like to hear from each one of you within—I would like a decision within a month so we know what we are going to do, and you need a decision within a month.

Let me—I would like for you to notify me by Friday, September 7, of what your proposals are. I would suggest that you are going to need to be talking to each other a week or two before that and try to work out an agreement. If you work out an agreement, I will go along with anything as long as it doesn't involve another trial.

Did you have any other questions, Mr. Wilson?

MR. WILSON: No, sir.

MR. FITZPATRICK: No, Your Honor.

THE COURT: I would also like—

MR. PHILIPPS: Could I just ask—Could we have—I think really we need more time. Even though it's going to go cutting into our trial date of January, I think it's going to be very significant evaluation in Washington. Could we get an additional two more weeks on the September 7th date?

THE COURT: Well, I will bargain with you. I will give you September 14. That will be another week, and if you realistically need more time, tell me why, but I don't want to leave you open-ended.

MR. PHILIPPS: I really think it's going to go up to a lot of hierarchical levels, Your Honor. I really do.

THE COURT: I have confidence, and you have given me an answer when I needed it, but I know you don't have control over people above you, but do tell them that I am serious about a January trial, that it's got to be tried, and they can't expect you to get ready to do whatever you need to do in that—

MR. PHILIPPS: That's correct, Your Honor.

THE COURT: I would also like on that date, the 14th, an order of injunction to be issued, and that will solve part of the timing problem, and you can make whatever preliminary plans you need to make.

Do anything unless you want to just for general reasons. Go ahead and make changes, but don't make changes because of this lawsuit until we get the injunction issued, and then I would like to build in a ninety-day period for the formal changes in the injunction. I think it will be a very simple injunction.

MR. PHILIPPS: Do you want us to prepare—

THE COURT: Why don't you prepare it and then—Well, let's make it easy. Mr. Wilson, why don't you prepare a version and send it to me, and you prepare a version and send it to me on the same day, and I will look at both of them, and I will enter the one I like best or I will adapt one or the other.

I don't mean my comments to say that I will not consider any motion for new trial or any brief that you file. I can't conceive of you filing one except on the attorney fee issue. I will consider—

MR. PHILIPPS: Attorney fee or exemption issue, Your Honor?

THE COURT: Well, the exemption. Well, I will consider anything you file, but I do want you to do that again with the understanding that I would want any other matters disposed of in January. I keep pressing that because I don't think there are any other matters that need to be resolved, so understand that also, but you know, if Mr. Wilson has got a motion to file, then he needs to file them after his client. It's just I hope that I have done a good enough job in resolving the issue.

MR. PHILIPPS: I think that is a very good suggestion, Your Honor, that might possibly be chosen. I am thinking of a scenario whereby the Government might want to raise certain, quote, factual, unquote, possibilities and perhaps get a ruling from Your Honor on those and dispose of the matter.

THE COURT: But the only caveat I give to you is that there has got to be a decision on whether you are going to appeal, because the Defendants are going to need to know whether to file a motion to appeal after the injunction is issued, and your time to appeal is going to start running from pretty close after that injunction is actually issued.

MR. WILSON: One other thing, Your Honor, just for the purpose of the record, we can presume that our Motion on the Constitutional Issue is—

THE COURT: I am sorry; I forgot to say that. Yes; and the outstanding Motion for Summary Judgment is overruled, and the Arizona case addressed, that issue also, and I think that's all of the pending motions.

MR. PHILLIPS: Yes, Your Honor, it is.

THE COURT: Okay. Well, I will expect to hear from you by the 14th, and we will stand adjourned.

Thank you.